533 F.2d 1395
 UNITED STATES of America, Appellee,
v.
Nicholas CIVELLA, Appellant.
UNITED STATES of America, Appellee,
v.
Anthony Thomas CIVELLA, Appellant.
UNITED STATES of America, Appellee,
v.
Frank Anthony TOUSA, Appellant.
UNITED STATES of America, Appellee,
v.
Joseph BARLETTA, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas FONTANELLO, Appellant.
 Nos. 75-1522, 75-1525, 75-1528, 75-1530 and 75-1532.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 11, 1975.
Decided April 16, 1976.
 
 James Patrick Quinn, Quinn & Peebles, Kansas City, Mo., for appellant, Nicholas Civella.
 Anthony J. Romano, Kansas City, Mo., for appellant, Anthony Thomas Civella.
 Jerome F. Waterman, Kansas City, Mo., for appellant, Thomas Fontanello.
 Michael A. DeFeo, Atty., Dept. of Justice, Kansas City, Mo., made argument for appellee.
 Cordell Siegel, St. Louis, Mo., for all appellants.
 Robert G. Duncan, Kansas City, Mo., for appellant, Frank Anthony Tousa.
 Willard L. Pollard, Kansas City, Mo., for appellant, Joseph Barletta.
 Before LAY, BRIGHT and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 These five consolidated appeals come to us from the United States District Court for the Western District of Missouri. The defendants, Nicholas Civella, his nephew, Anthony Thomas Civella, Frank Anthony Tousa, Joseph Barletta and Thomas Fontanello, along with Martin Chess and Phillip Saladino, were jointly charged in the fifth count of a five count indictment with having unlawfully conspired in violation of 18 U.S.C. § 371 to violate the provisions of 18 U.S.C. § 1084 and 18 U.S.C. § 1952.[1] The charge against the Civellas, Tousa and Barletta was submitted to District Judge William R. Collinson on a stipulation of facts entered into subject to defense contentions put forward in numerous pretrial motions which were denied by the district court.[2] Fontanello joined in certain paragraphs of the stipulation but refused to join in others; his case was tried to Judge Collinson without a jury. Martin Chess entered a plea of nolo contendere; the defendant Saladino was granted a continuance. All of the appealing defendants were found guilty; all were sentenced to imprisonment, and all but Barletta were fined.
 
 
 2
 The appeals were consolidated and were briefed and argued together. The record in the case is most voluminous.
 
 
 3
 In the last analysis, the government's case against the respective defendants is based on the results of a wiretap of a pay telephone in the Northside Social Club, also known as The Trap, located at 1048 East Fifth Street in Kansas City, Missouri. The local number of the telephone is or was 421-8727. The building in which The Trap is or was located is owned by the defendant, Nicholas Civella, and it appears that the establishment was operated at relevant times by the defendant, Tousa.
 
 
 4
 The wiretap interception was authorized by Judge Collinson on January 7, 1970 on the application of David H. Martin, a Special Attorney of the Department of Justice assigned to the Kansas City "strike force."[3] The authorizing order was entered pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq., hereinafter called the Act.
 
 
 5
 The interception was authorized for a period of ten days beginning on January 8, 1970. The last interception was effected on January 16 or January 17. On the date last mentioned Judge Collinson issued a warrant commanding the search of certain premises and the seizure of certain materials; the warrant was executed and some seizures of gambling records and paraphernalia took place.
 
 
 6
 The validity of the conviction of the defendants hinges upon the validity of the authorizing order and upon whether after the interception was terminated there was adequate compliance with the inventory provisions of 18 U.S.C. § 2518(8)(d). All of the defendants contend for reversal that the Act was substantially violated, and that the results of the wiretap and evidence obtained as a result of the tap should have been suppressed as provided by § 2515 and § 2518(10)(a).
 
 
 7
 In addition, the defendants contend jointly that Title III of the Act is unconstitutional, and that the proceedings against them were invalidated by the participation therein of strike force attorneys, including Special Attorney Martin.
 
 
 8
 The defendant Fontanello contends separately that in any event the evidence against him, including the results of the wiretap, was insufficient to sustain his conviction.
 
 
 9
 Apart from the ultimate fact of guilt or innocence, the background facts of the case are not in serious dispute.
 
 
 10
 Nicholas Civella is well known to both state and federal law enforcement officers. He is at least supposed to be the leader or one of the leaders of organized crime in the Kansas City area. His activities in the field of illegal gambling and those of his associates were the subject of intensive FBI investigation for months before wiretap authorization was sought from the district court. The investigation produced a great deal of information from confidential informants who for obvious reasons would have been unwilling to testify in court to what they told the FBI.
 
 
 11
 In view of the stipulation that has been mentioned, there is no question that during the period defined in the indictment, which period extended from about July 1, 1968 to about January 17, 1970, Nicholas Civella and the other defendants, with the possible exception of Fontanello, were engaged in a conspiracy to violate 18 U.S.C. §§ 1084 and 1952 and that overt acts in furtherance of the conspiracy were committed.
 
 
 12
 The object of the conspiracy was to engage on a large scale in bookmaking gambling prohibited by Missouri law, V.A.M.S. 563.350 and 563.360. Wagers were accepted on such sporting events as football and basketball games, and at times wagers that had been accepted were "laid off" with other gamblers to protect the conspirators from loss. Like all large bookmaking operations, this one involved the extensive use of telephone communications including both long distance and local and interstate and intrastate calls.
 
 
 13
 The FBI's investigation led it to conclude that the bookmaking operation was being conducted principally by the defendants Anthony Civella and Tousa for their own benefit and for the benefit of Nicholas Civella. It was also concluded that The Trap was a principal center of the operation, and that the pay telephone that has been identified was being used at least by Tousa in the carrying on of the business of the operation.
 
 
 14
 On the basis of the FBI investigation and after the results of that investigation had been considered in the Department of Justice, Special Attorney Martin was authorized to apply to the district court for a wiretap order as provided by § 2518(1). He made the application, and it was granted by Judge Collinson after an ex parte hearing. The authority listed no one but Tousa as a prospective interceptee, and the authority was limited to times during which Tousa was observed to be present physically on the premises of The Trap, and no conversation was to be monitored or recorded unless the FBI agents conducting the tap were able to establish by voice recognition the fact that Tousa was one of the parties to the conversation.
 
 
 15
 After the wiretap was terminated, Judge Collinson directed that inventories be served on Tousa, the Civellas, and on two other individuals who were not indicted. While the inventories should have been served not later than ninety days after the expiration of the authorized period of the interception, they were not in fact served within that period of time, although they were served soon after that period expired. No order was ever entered directing service of inventories on Barletta or Fontanello, and neither was ever served with an inventory.
 
 
 16
 Three indictments have been returned in the case. The first indictment, returned in October, 1970, and the second indictment, returned in March, 1971, did not name either Barletta or Fontanello as a party defendant. They were brought into the case when the third indictment, the one with which we are concerned, was returned in October, 1971.
 
 
 17
 Due to the large number of motions filed by the defendants, and perhaps for other reasons, the case remained in the district court from October 1971 until it was disposed of finally in the spring and summer of 1975.
 
 
 18
 Other facts will be stated as the opinion proceeds.
 
 I.
 
 19
 We take up first and deal briefly with the defendants' attack on Title III of the Act and with their complaint about the strike force attorneys.
 
 
 20
 As to the complaint last mentioned, counsel for the defendants take note of the adverse holdings of this court in DiGirlomo v. United States,520 F.2d 372 (8th Cir.), cert. denied, --- U.S. ----, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975); United States v. Agrusa, 520 F.2d 370 (8th Cir. 1975); and United States v. Wrigley, 520 F.2d 362 (8th Cir.), cert. denied,--- U.S. ----, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975); see also Scott v. United States, 522 F.2d 621 (8th Cir. 1975). Counsel state that the point is raised for record purposes only; it is not argued in the briefs, and we reject the contention.
 
 
 21
 Likewise, counsel recognize that we have upheld as constitutional Title III of the Act. United States v. John, 508 F.2d 1134 (8th Cir.), cert. denied, 421 U.S. 962, 95 S.Ct. 1948, 44 L.Ed.2d 448 (1975); United States v. Wolk, 466 F.2d 1143 (8th Cir. 1972); and United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). We adhere to those decisions.
 
 
 22
 Moreover, we deem it well to say that we agree with the district court that Special Attorney Martin was properly authorized under § 2516 to apply for wiretap authority. And we find, in general and subject to the particular objections of the defendants, that the application and order authorizing the wiretap complied with the requirements of the Act in form and content.II.
 
 
 23
 Title III of the Act sets out a detailed procedure whereby district judges are authorized to grant authority to the FBI and other law enforcement agencies to intercept electronically for limited periods of time, not to exceed thirty days, oral and wire communications in cases in which crimes of certain types, including violations of 18 U.S.C. §§ 1084 and 1952 are being investigated. The granting of such authority is circumscribed by stringent conditions designed to protect persons from illegal or unreasonable interceptions and to minimize interceptions of communications which are not subject otherwise to interception.
 
 
 24
 18 U.S.C. § 2515 provides in general that if an interception is conducted in violation of Title III, the results of the interception and evidence developed from the interception are not admissible in evidence in a number of types of proceedings, including grand jury proceedings and criminal trials. Specific grounds for suppression are set out in § 2518(10)(a). Moreover, a person who is aggrieved by an unlawful interception is given a civil action for damages, both actual and punitive, and, in addition, may recover a reasonable attorney's fee. 18 U.S.C. § 2520.
 
 
 25
 As far as this case is concerned, the most important section of the statute is 18 U.S.C. § 2518, the various subdivisions of which prescribe procedures for the obtaining of wiretap authority, the conditions under which such authority may be granted, the persons who must be identified as those whose communications will be intercepted, the findings that must be made before authority can be granted, and the proceedings that must take place after an authorized interception has come to an end or after the authorized period for an interception has expired.
 
 
 26
 It is established that not every violation of § 2518 calls for suppression; minor violations or noncompliance may be ignored. However, it is also established that if there is a substantial violation of a provision of the statute that is central or functional in promoting the congressional purpose to prevent abuses in wiretapping, suppression may be required even though the violations do not amount to constitutional deprivations. United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). See also, in addition to the Eighth Circuit cases cited heretofore, United States v. Donovan, 513 F.2d 337 (6th Cir. 1975); United States v. Bernstein, 509 F.2d 996 (4th Cir. 1975); United States v. Doolittle, 507 F.2d 1368, adhered to on rehearing en banc, 518 F.2d 500 (5th Cir. 1975); United States v. Chun, 503 F.2d 533 (9th Cir. 1974); and United States v. Martinez, 498 F.2d 464 (6th Cir.), cert. denied, 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d 654 (1974).
 
 
 27
 While we think that the Act, like other statutes, must be construed and applied with practicality and that ordinarily substantial, rather than literal, compliance with its terms suffices, particularly where the government has acted in good faith and where an affected person has sustained no prejudice as a result of an absence of literal compliance, still it must be recognized that the Act expresses a strong public policy against unnecessary, unreasonable or indiscriminate wiretapping. And where there is a substantial violation of a central and significant provision of the Act, suppression may be required even where the government has acted in good faith and the party whose communications have been intercepted has sustained no actual prejudice as a result of the violation.
 
 
 28
 In Chun, supra, which was decided soon after the Supreme Court decisions in Chavez and Giordano, both supra, the Court of Appeals for the Ninth Circuit laid down certain guidelines for determining whether a violation of Title III of the Act calls for suppression of the results of a wiretap; it said:
 
 
 29
 In resolving this issue, Chavez and Giordano suggest that there are several important factors which should be considered. As an initial matter, it must be determined whether the particular procedure is a central or functional safeguard in Title III's scheme to prevent abuses. Chavez, supra, 416 U.S. at 578, 94 S.Ct. at 1857 (40 L.Ed.2d at 393) ; Giordano, supra, 416 U.S. at 516, 94 S.Ct. at 1826 (40 L.Ed.2d at 353) . . .. If this test has been met, it must also be determined whether the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error. Chavez, supra, 416 U.S. at 573-574, 94 S.Ct. at 1855 (40 L.Ed.2d at 391); Giordano, supra, 416 U.S. at 524-528, 94 S.Ct. at 1831 (40 L.Ed.2d at 358). While in most situations it would not be necessary to reach beyond the above-mentioned factors, it may be that in some instances they will not be completely determinative. In such cases, Chavez implicitly suggests a third factor which may have a bearing on the issue i. e. whether the statutory requirement was deliberately ignored; and, if so, whether there was any tactical advantage to be gained thereby.
 
 
 30
 503 F.2d at 542.
 
 III.
 
 31
 It is first claimed that the application filed by Special Attorney Martin and the order based thereon did not comply with the requirements of § 2518(1)(b) and were fatally defective because the application recited that it was based on an affidavit by FBI Special Agent Spencer Hellekson and that a copy of his affidavit was attached to the application, whereas in truth and in fact no affidavit of Hellekson was attached to the application and no such affidavit was presented to the district court. We find that contention to be without merit.
 
 
 32
 It is true that the Martin application erroneously stated that it was supported by Hellekson's affidavit, but the error did not influence Judge Collinson or anyone else in concluding that wiretap authority should be granted, and it did not prejudice the defendants. Therefore, it can be ignored. Cf. United States v. Chavez, supra, 416 U.S. at 573-80, 94 S.Ct. at 1855, 40 L.Ed.2d at 391; United States v. Schaefer, 510 F.2d 1307, 1310 (8th Cir.), cert. denied, 421 U.S. 975, 95 S.Ct. 1975, 44 L.Ed.2d 466 (1975); United States v. Thomas, 508 F.2d 1200, 1203 (8th Cir.), cert. denied, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975); United States v. John, supra, 508 F.2d at 1137; United States v. Brick, 502 F.2d 219, 222-23 (8th Cir. 1974).
 
 
 33
 The record makes it clear that at least two Special Agents of the FBI were concerned in the investigation. One of them was Mr. Hellekson, and the other was Special Agent William N. Ouseley. The original affidavit in support of the application was prepared and signed by Hellekson and was mentioned in the application that was prepared at about the same time. However, when the Hellekson affidavit was considered in the Department of Justice it was found to be insufficient in content. A new affidavit was then prepared and executed by Ouseley, and that was the affidavit that was ultimately submitted to and considered by Judge Collinson on January 7, 1970. The whole problem arises from the fact that Mr. Martin simply failed to change his original application that mentioned the Hellekson affidavit.
 
 
 34
 We agree with Chief Judge Becker that the error was merely clerical and that it did not substantially affect the sufficiency of the application or the judicial action thereon.
 
 IV.
 
 35
 The next contention is that the application and the order based thereon violated §§ 2518(1)(b)(iv) and 2518(4)(a) in that they did not identify any defendant other than Tousa as a person whose communications would be intercepted.
 
 
 36
 Section 2518(1)(b)(iv) provides that the application must identify the person "if known" committing the offense and whose communications are to be intercepted. And § 2518(4)(a) states that the authorizing order must specify the identity of the person "if known" whose communications are to be intercepted.
 
 
 37
 Relying on cases like United States v. Kahn, supra; United States v. Donovan, supra; and United States v. Bernstein, supra, defendants argue that as of January 7, 1970 the government had probable cause to believe that at least the Civellas were involved in the conspiracy, and that their communications, as well as those of Tousa, would be intercepted. Hence, it is contended that the application and order were fatally defective in naming Tousa as the sole interceptee.
 
 
 38
 An argument subsidiary to the one just mentioned is that the district court erred in overruling a motion for an evidentiary hearing filed shortly before final submission of the case to the district court, the purpose of which hearing was to establish the existence of probable cause with respect to the Civellas and perhaps as to Barletta and Fontanello as well.
 
 
 39
 The arguments in question are clearly unavailable to Tousa who was named in the application and order. It is not entirely clear to us whether those arguments are put forward as to all of the other four defendants or whether they are actually limited to Nicholas Civella and Anthony Civella. However, the ultimate view that we take of the case renders it unnecessary for us to decide whether the government had probable cause to believe on January 7, 1970 that Barletta and Fontanello were committing the offenses under investigation and would likely be in communication with Tousa on the telephone located in The Trap or whether the district court erred when it refused to grant the evidentiary hearing requested by the defendants substantially more than three years after the indictment had been returned and after Judge Becker had denied the plethora of earlier motions filed by the defendants jointly and singly after the return of the instant indictment in October, 1971. Further discussion in this section of the opinion will be limited to the principal argument that has been mentioned as that argument is applicable to the Civellas.
 
 
 40
 It is obvious from the record that for many months prior to January 7, 1970 the government had probable cause to believe that Nicholas and Anthony Civella were involved with Tousa in an illegal gambling operation in which the telephone in The Trap would be used. The question, however, is whether on or before the date of the application for the wiretap authority the government had probable cause to believe that either Nicholas Civella or Anthony Civella would be in communication with Tousa on the target telephone.
 
 
 41
 The record reflects that Special Agent Ouseley filed two detailed affidavits outlining what had been done and learned in the course of the over-all investigation of the suspected conspiracy. One of those affidavits was the one relied on by Judge Collinson in granting the wiretap application; the other, filed on January 17, 1970 in support of an application for a search warrant, is largely a repetition of the first.
 
 
 42
 Accepting as true the statements appearing in those affidavits, it appears that prior to January 7, 1970 the government had probable cause to believe that Nicholas Civella was the head or one of the leaders of an extensive criminal organization in Kansas City which organization is referred to at times as "the outfit"; that the bookmaking under investigation was an "outfit" operation; that Anthony Civella and Tousa were actively carrying on the operation as subordinates of Nicholas Civella; that Anthony Civella was obtaining daily wagering information from the defendant Chess in Las Vegas, Nevada, and that Tousa was obtaining similar information from other sources; that The Trap was the center or a principal center of the operation; and that Tousa was making extensive use of the phone in the prosecution of the business of the operation.
 
 
 43
 Granting that the government had reasonable cause to believe that the facts above stated existed, it seems unrealistic to us to say that the government did not have reasonable cause to believe that at some stage during the wiretap period Tousa would be in communication with the respective Civellas or they with him by means of the target telephone, and that the communications would be intercepted. And in this connection, it is to be observed that the indictment charges, among other things, that it was a part of the conspiracy that Anthony Civella would pass on to Tousa the "sports line" that the former was receiving from Las Vegas. While the government probably did not have actual knowledge of that fact prior to the interceptions, we think that the government did have probable cause to believe prior to January 7 that Anthony Civella and Tousa would exchange information and that the telephone at The Trap would probably be used to that end.
 
 
 44
 It follows, therefore, that in order to comply literally with the relevant subsections of the statute it was necessary for the government to identify the Civellas in the application and for the district court to identify them, as well as Tousa, in the authorizing order. That, of course, was not done, but after the wiretap had come to an end, both Civellas along with Tousa were ordered to be served with inventories as provided by § 2518(8)(d), and they were served with inventories.
 
 
 45
 The question on this phase of the case, then, is whether the failure to comply literally with the requirements of §§ 2518(1)(b)(iv) and 2518(4)(a) invalidated the order of January 7 as far as the Civellas were concerned and required the suppression as to them of the results of the wiretap and evidence discovered by reason of those results.
 
 
 46
 The decision of the Supreme Court in United States v. Kahn, supra, was a negative one to the effect that where the government does not have reasonable cause to believe that an individual is involved in a criminal operation that will probably involve him in culpable communications by means of a target telephone, the government is not required to name him in the initial application for wiretap authority and the district court is not required to identify him in the authorizing order, although in its discretion the district court later may order him to be served with an inventory as provided by § 2518(8)(d).
 
 
 47
 Kahn can be read as holding, in converse, that where the government has probable cause to believe that a number of persons are involved in criminal conduct and that their communications in connection with that conduct are likely to be intercepted if certain wiretap authority is granted, it is mandatorily required that all of those persons be identified as prospective interceptees in both the application for the authority and in the authorizing order, and that a failure to do so constitutes a violation of a central and significant requirement of the statute and requires suppression of wiretap results as to the unidentified persons even though they receive notice later that their conversations have been intercepted.
 
 
 48
 The Kahn case has been so read in United States v. Donovan and United States v. Bernstein, both supra. A different result has been reached by the majority of a divided Court of Appeals for the Fifth Circuit in United States v. Doolittle, supra.[4]
 
 
 49
 In Doolittle, as here, plural defendants were indicted for violations of 18 U.S.C. § 1084 and § 1952, and, as here, the government's case was based on the results of an authorized wiretap. As to three defendants the government when it obtained the wiretap authority had probable cause to believe that they were involved in the offense and that their communications would probably be intercepted. They were not identified in the application or in the authorizing order. However, the district court later directed that inventories be served on them; they were served on the defendants in question; the tape recordings of their conversations were made available to them, and they sustained no prejudice as a result of not being identified originally. The district court denied their motions to suppress; they were convicted and appealed.
 
 
 50
 A majority of a three judge panel of the Court of Appeals affirmed the conviction. It was said:The wiretap authorization referred to "Billy Cecil Doolittle and others as yet unknown." Anderson and Baxter contend that the Government had reasonable cause to believe that their conversations would be intercepted. Relying on certain language in the Supreme Court's opinion in Kahn, they argue that, not being "unknown," they should have been named in the authorization. They contend that since they were not named, the wiretap order was illegal as to their conversations. The same argument could be made for Sanders. We reject this argument. The defendants neither allege nor demonstrate any prejudice to them in not being named in the authorization. The Government contends that its agents had personal knowledge, as opposed to information, to support probable cause as to illegal activity only of Doolittle, the co-owner of the Sportsman's Club, the establishment wherein the telephones were located and to which the telephone bills were sent. All defendants received an inventory of the intercepted conversations, were allowed to listen to the tapes and received transcripts of the conversations prior to use against them at trial, as if they had been named in the order. Most of the conversations of each defendant were with Doolittle, the person named in the order. There is no indication of bad faith or attempted subterfuge by the Government in its wiretap application. The application and affidavit delineated specifically the information expected to be gathered from the tap. We hold there was substantial compliance with the requirements of the Act, and that the failure to name other defendants does not render the evidence obtained as to them inadmissible under 18 U.S.C. § 2518(10) (a).
 
 
 51
 507 F.2d at 1371-72.
 
 
 52
 The defendants moved for rehearing en banc, and their application was granted. 507 F.2d at 1377. The case was heard en banc by fourteen of the fifteen Circuit Judges in regular commission; an eight judge majority voted to uphold the panel decision and expressed their view in a per curiam opinion. 518 F.2d at 500-01. Chief Judge Brown and Circuit Judges Wisdom, Goldberg and Simpson joined Judge Thornberry in the dissent that he filed as a member of the original panel. 518 F.2d at 501. Judge Godbold filed a separate dissent in which he differed not only with the majority but also to a certain extent with his fellow dissenters. 518 F.2d at 501-04.
 
 
 53
 The question is not without difficulty because we have no doubt that the initial identification requirements of the statute are central and significant requirements and are not lightly to be ignored. However, we, like the majority of the Doolittle court, are unwilling to say that a defendant who ought to have been identified initially is automatically entitled to have evidence of his communications suppressed merely because he was not identified originally as a potential interceptee.
 
 
 54
 We think that if the identification requirements of the Act are satisfied with respect to the individuals who are identified originally, and if defendants who were not identified originally, although they should have been, are promptly notified in substantial compliance with § 2518(8)(d) of the fact and circumstances of the interception of their communications so that they may apply to the issuing judge for an order making available to them the contents of the intercepted communications, the purpose of §§ 2518(1)(b)(iv) and 2518(4) (a) has been achieved and that there has been a sufficient substantial compliance with those subsections.
 
 
 55
 In the instant case there is nothing to suggest that the government acted in bad faith or with deceptive intent when it failed to identify the Civellas in the application, or that it had anything to gain by not naming them, or that Judge Collinson would have acted differently than he did had the Civellas been named. When the matter reached the stage at which the inventory requirements of § 2518(8)(d) came into play, counsel for the government brought the Civellas to the attention of the district judge to the end that they might be served with inventories. Inventories were served on them and the recordings of their conversations were made available to them well in advance of final submission of the case.
 
 
 56
 Therefore, we reject the contentions of the Civellas based on noncompliance with §§ 2518(1)(b)(iv) and 2518(4)(a).
 
 V.
 
 57
 The remaining contention made by the defendants jointly is based on alleged noncompliance with § 2518(8)(d) which has already been mentioned from time to time.
 
 
 58
 Insofar as here pertinent, that subsection provides that within a reasonable time but no more than ninety days after the expiration of an authorized interception period the judge authorizing the interception must cause inventories to be served on all persons mentioned in the order and may in his discretion order that inventories be served on such other parties as the judge determines should be served in the interests of justice. The inventory must reveal the fact of the entry of the order; the date of the entry and the period of approval of the interception; and the fact that communications of the person involved were or were not intercepted. And the subsection then goes on to provide that the district judge may in his discretion make available to such person or his attorney for inspection such portions of the intercepted communications and of the application and order as the judge determines to be in the interest of justice. While the subsection permits the district judge on ex parte application and for good cause shown to postpone the service of inventories, he is not given any authority to dispense with them altogether.
 
 
 59
 The Civellas and Tousa concede that they were served with inventories, but they complain that they were not served within the statutory ninety day period.
 
 
 60
 As stated, Barletta and Fontanello were not indicted until October, 1971; Judge Collinson never entered an order directing that § 2518(8)(d) inventories be served on them, and they were never served with such inventories. It was only after they were indicted that they received any direct and positive knowledge that conversations of theirs had been intercepted and had made available to them the tapes of the recordings of the conversations involving them.
 
 
 61
 The interception period ended on January 18, 1970, and the ninety day period for the serving of inventories expired on April 18 of that year. On March 27, 1970 Judge Collinson ordered inventories served on the Civellas, Tousa and certain other persons, not including Barletta and Fontanello. Since the Civellas and Tousa were local people, the marshal should have had no difficulty in effecting service well within the ninety day period. However, for some reason not disclosed by the record Tousa was not served until April 23, 1970 which was five days after the expiration of the ninety day period, and the Civellas were not served until May 1, 1970 which was thirteen days after the expiration of the ninety day period.
 
 
 62
 A § 2518(8)(d) problem was squarely presented to this court in United States v. Wolk, supra. In that case the time for serving inventories, as extended, expired on June 30, 1971. The prospective defendants were arrested before indictment on June 21 and June 22. On June 22 the district court ordered inventories served on all of the defendants, and the inventories were placed in the hands of the marshal for service; by June 24 all of the defendants save three had been served. The defendants were indicted on June 25. The three defendants who had not been served with inventories were arraigned in July and August. By the time of arraignment counsel for all three of those defendants had received copies of the application, supporting affidavit, and the order authorizing the interception. After the arraignments counsel for all of the defendants were permitted to inspect and copy both the original tapes and the transcript of the recordings. Two of the three defendants in question were not served inventories until September 4, 1971, and the third one was never served with an inventory.
 
 
 63
 As to those three defendants, the district court suppressed the results of the wiretap, and the government appealed. This court reversed. It was held that in spite of the delay in serving inventories on two of the three appellees and in spite of the fact that one of them was never served with an inventory, there had been substantial compliance with § 2518(8)(d). It was emphasized that there was no showing of intentional violation of the statute, and that the defendants had not been prejudiced by the lack of compliance with the statute.
 
 
 64
 While there are points of distinction between Wolk and the instant case, it would appear that application of Wolk, as such, to this case, would probably result in a rejection of the contention of at least the Civellas and Tousa. Wolk, however, was decided substantially prior to the Giordano and Chavez decisions of the Supreme Court, a point specifically noted in United States v. Donovan, supra, 513 F.2d at 343, and perhaps too much reliance should not be placed on it today.
 
 
 65
 Although § 2518(8)(d) does not come into play until after a wiretap has been completed, still it has been held to be a substantial and functional part of the congressional policy of limiting wiretapping, United States v. Donovan, supra, 513 F.2d at 343-44, and United States v. Chun, supra, 503 F.2d at 542, and we shall so consider it.
 
 
 66
 We take up, first, the § 2518(8)(d) claim of the Civellas and Tousa. It does not appear to us that the statute was deliberately ignored, or that the government undertook to delay service of the inventories on those defendants or that it had anything to gain by the delays which were extremely short as compared to those involved in Wolk. Nor, in our opinion did the delays prevent the purpose of § 2518(8)(d) from being achieved. The purpose of that subsection is to insure that a person whose communications have been intercepted receives notice of that fact within a comparatively, though not extremely, short period of time after the expiration of the interception period. Had the inventories been served promptly, and we do not know why they were not served promptly, § 2518(8)(d) would have been satisfied literally, and we do not consider that the five day delay in the case of Tousa and the thirteen day delay in the case of the Civellas were significant. As indicated, Tousa was served in late April, 1970, and the Civellas were served on May 1 of that year. The first indictment was not returned until October.
 
 
 67
 We conclude, therefore, that there was substantial compliance with the inventory requirements of the statute as far as Tousa and the Civellas were concerned, and we reject their § 2518(8)(d) contention.
 
 
 68
 A quite different situation is presented with respect to Barletta and Fontanello. As to them, no effort was made to comply with the inventory requirements of the statute and those defendants received no notice of the interceptions of their communications until the third indictment was returned nearly two years after the authorized wiretap had come to and end. And it would be stretching things too far to say that the fact that they received full information about the interceptions after they were indicted in the fall of 1971 amounted to a substantial compliance with the statute. The wiretap evidence should have been suppressed as to them.
 
 VI.
 
 69
 From what has been said, it follows that the convictions of Tousa and the Civellas will be affirmed. The convictions of Barletta and Fontanello will be reversed, and the cause remanded with directions that judgments of acquittal be entered as to them.
 
 
 70
 The disposition that we make of Fontanello's case makes it unnecessary for us to determine whether in any event the evidence was sufficient to support his conviction. We will say that the evidence against him was extremely weak and consisted of nothing but the interpretation which an FBI expert placed on one ambiguous conversation on the telephone between Fontanello and Tousa.
 
 
 71
 Affirmed as to Nicholas Civella, Anthony Thomas Civella and Frank Anthony Tousa.
 
 
 72
 Reversed and remanded with directions as to Joseph Barletta and Thomas Fontanello.
 
 
 
 [1]
 Section 1084(a) makes it an offense for any person who is engaged in the business of betting or wagering knowingly to use a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers. Section 1084(b) provides that nothing in the section is to be construed as prohibiting the interstate or foreign transmission of news reports concerning sporting events or information dealing with betting or wagering on a sporting event from a state in which betting or wagering on the event in question is legal to a state in which betting or wagering on the event is also legal
 Section 1952 makes it a federal crime for any person to travel in interstate commerce or to use any facility of interstate commerce, including the mail, to distribute the proceeds of any unlawful activity or to otherwise promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of any unlawful activity.
 
 
 [2]
 Practically all of the motions were passed upon by Chief District Judge William H. Becker
 
 
 [3]
 See 28 U.S.C. § 515
 
 
 [4]
 According to the current issues of Shephard's Federal Citations, Part I, petitions for writs of certiorari in all three of those cases are now pending in the Supreme Court