549 F.2d 1126
 UNITED STATES of America, Appellee,
v.
John Anthony COSTANZA, Appellant.
UNITED STATES of America, Appellee,
v.
Joseph Anthony BECCHINA, Appellant.
UNITED STATES of America, Appellee,
v.
Thomas Joseph CIRCO, Appellant.
UNITED STATES of America, Appellee,
v.
John Joseph SCIORTINO, Appellant.
UNITED STATES of America, Appellee,
v.
Peter Joseph SIMONE, Appellant.
UNITED STATES of America, Appellee,
v.
Frank TOUSA, Appellant.
 Nos. 76-1627, 76-1658 and 76-1668 to 76-1671.
 United States Court of Appeals,
Eighth Circuit.
 Submitted December 17, 1976.
Filed February 17, 1977.
Rehearing and Rehearing En Banc Denied in Nos. 76-1627 and
76-761 March 10, 1977.
 
 Robert G. Duncan, Kansas City, Mo., for Costanza.
 James L. Eisenbrandt, Mission, Kan., for Becchina, Circo and Sciortino.
 Anthony J. Romano, Kansas City, Mo., for Circo, Sciortino and Simone; Ronald E. Partee and James R. Derting, Jr., Kansas City, Mo., on brief.
 Lewis E. Pierce, Kansas City, Mo., for Tousa.
 David B. Helfrey, Sp. Atty., U.S. Dept. of Justice, Bert C. Hurn, U.S. Atty., Kansas City, Mo., for appellee; William A. Keefer, Sp. Atty., U.S. Dept. of Justice, Kansas City, Mo., on brief.
 Before STEPHENSON and HENLEY, Circuit Judges, and MEREDITH,* District Judge.
 HENLEY, Circuit Judge.
 
 
 1
 On December 10, 1975 a federal grand jury sitting in the Western District of Missouri returned a one count indictment charging ten individuals with having operated in Kansas City, Missouri over a period extending from about August 1, 1973 to about January 30, 1974 an organized, large scale, bookmaking operation involving sporting events in violation of Missouri law and in violation of 18 U.S.C. § 1955. The defendants named in the indictment were John Anthony Costanza, Joseph Anthony Becchina, Thomas Joseph Circo, John Joseph Sciortino, Peter Joseph Simone, Frank Tousa, Nicholas DiGirlomo, Joseph George Palmentere, Jr., Benjamin Palmentere and Robert Vincent Gulotta. Other individuals identified as being criminally involved in the operation but not indicted were Vincent Picone, Anthony Simone, Joseph Goodfellow and Larry Riley.
 
 
 2
 The defendants pleaded not guilty and filed numerous pretrial motions including motions to suppress evidence obtained by the government on the basis of interceptions of oral and wire communications, which interceptions had been authorized by the district court[1] in October and November, 1973. In the spring of 1976 the district court held hearings on the motions, including the motions to suppress. The motions to suppress filed by Nicholas DiGirlomo, Robert Vincent Gulotta and the Palmenteres were sustained.[2] Similar motions and other motions filed by the remaining defendants were denied, and the case as to them stood for trial.
 
 
 3
 Tousa and Costanza were tried jointly before a jury in June, 1976 with Judge Collinson presiding, and they were found guilty and sentenced to imprisonment. The case as against Becchina, Circo, Sciortino and Simone was submitted to Judge Collinson on stipulations of fact which reserved all rights of the defendant under earlier motions which had been denied by the district court. Those defendants were found guilty and sentences were imposed. All six of the defendants have appealed, and the appeals were consolidated for purposes of argument.
 
 
 4
 While we have six appeals before us, we actually have three cases which we will discuss separately. Those cases are the Tousa-Costanza case, the Circo-Sciortino-Simone case, and the Becchina case. As to the case last mentioned, we note that Becchina makes some contentions that are advanced by the defendant Circo, Sciortino and Simone; Becchina also makes an individual contention of his own.
 
 
 5
 Although the separate cases will be discussed individually, it is desirable to state the over-all facts applicable to all of the cases and in that connection and by way of background to refer to an earlier case in which Frank Tousa was a principal defendant.
 
 
 6
 Prior to 1970 a large scale bookmaking operation was being conducted in Kansas City by a number of people including Tousa, Nicholas and Anthony Civella, Joseph Barletta and Thomas Fontanello. Those people and others were indicted, were tried before Judge Collinson and were convicted. They appealed and the convictions of the Civellas and of Tousa were affirmed. The convictions of Barletta and Fontanello were reversed. United States v. Civella, 533 F.2d 1395 (8th Cir. 1976).[3]
 
 
 7
 The gambling operation involved in that case was centered at the North Side Social Club, sometimes called "The Trap," located at 1048 East Fifth Street in Kansas City. In the course of the investigation a telephone located on the premises of "The Trap" was tapped under an authorizing order signed by Judge Collinson; thereafter search warrants were issued and served and incriminating evidence was obtained. The indictment in that case was returned in 1971 but due largely to defense maneuvering the case was not tried until about mid-1975, some months before the trials in the instant case were conducted. Our opinion in the Civella case, supra, was filed while pretrial motions in this case were being considered, and in ruling on some of those motions the district court took note of our opinion.
 
 
 8
 The return of the indictment in the Civella case did not put an end to organized bookmaking in Kansas City, and FBI investigations of the "outfit" continued. The specific investigation which resulted in the return of the indictment in this case commenced in December, 1972, and between that time and early October, 1973 the investigation consisted of FBI surveillances of people and places, examination of telephone company records, and the gleaning of information from confidential informants who were unwilling to testify as witnesses.
 
 
 9
 The FBI's investigation, which was conducted in cooperation with Special Attorneys of the Department of Justice assigned to the Kansas City "strike force," led the Bureau to believe that while Tousa had become more circumspect since 1970, he was still in charge of the "book," and that Costanza was probably his principal lieutenant. Other individuals were deemed to be playing less important parts in the operation.
 
 
 10
 The Bureau concluded that "The Trap" was still being used in connection with bookmaking, and that other premises in Kansas City were involved as well. One of those locations was the front office of Necco Tea & Coffee Co. (Necco) at 3616 Independence Avenue; another was the home of Costanza at 326 Olive Street; still another was an apartment located at 545 Prospect Avenue which Costanza visited frequently; and another was the home of "unindicted co-conspirator" Vincent Charles Picone at 4112 North Walrond Avenue. All of those premises were equipped with telephones, and there were two telephones in the Necco office.
 
 
 11
 On or about October 5, 1973 the government applied to Judge Collinson for authority to intercept electronically conversations that might take place on the Necco premises and to tap the two telephones located on those premises. Authority was also sought to tap the telephones located in the homes of Costanza and Vincent Picone. In addition the government sought to make use of a pen register device or devices in connection with all the telephone intercepts. That application was supported by a long affidavit submitted by Special Agent Schucker of the FBI.
 
 
 12
 18 U.S.C. § 2518(1)(b)(iv) provides that an application for intercept authority must identify the persons "if known" who are committing the offenses under investigation and whose communications are to be intercepted. And § 2518(4)(a) provides that an order authorizing interceptions must identify the persons "if known" whose communications are to be overheard. In view of those subsections, it was incumbent upon the government to identify in its application and it was necessary for the authorizing order to identify all persons whom the government had probable cause to believe were engaged in the illegal operation and whose communications would be intercepted. United States v. Donovan, --- U.S. ----, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).
 
 
 13
 The government's application identified as potential interceptees Frank Tousa, John A. Costanza, Vincent Charles Picone, Vincent Charles Abbot, Jim J. Moretina and "others yet unknown." The application was granted, and the district court's order made the same identifications as were contained in the application. Neither the application nor the order made any specific reference to Becchina, Circo, Sciortino or Simone.
 
 
 14
 Interceptions were authorized for a twenty day period, and with specific regard to the Necco premises it was provided that entry to the premises might be gained secretly or by force at any time of day or night which was least likely to jeopardize the security of the investigation for the purpose of installing or removing electronic equipment necessary to conduct the interception of oral communications on the premises.
 
 
 15
 The wiretaps were duly installed and during the small hours of October 10 FBI agents secretly, and doubtless with at least some degree of force, gained entry to the Necco premises, which were unoccupied, closed and locked, and installed their equipment. This equipment was kept in operation until about October 24 when it was deactivated.
 
 
 16
 The interceptions proved to be fruitful, and about November 6 the government applied for additional authority to continue the interceptions for another twenty days. That application, supported by another affidavit of Special Agent Schucker, was granted. The second application and the second order identified as potential interceptees Tousa, Costanza, Vincent Picone, Abbot, Moretina, Jean Picone, and "individual believed to be" the defendant Peter Simone, "and others as yet unknown." No mention was made of Circo, Sciortino or Becchina.
 
 
 17
 Apart from the differences in identifications just mentioned, there were two other differences between the first and the second order. In the second order authority to tap the phones in the Necco officer was deleted, but a tap of another phone at premises at 1740 Cherry Street, and listed in the apparently fictitious name of "Cy Parsons," was authorized.
 
 
 18
 The second order, like the first, authorized interceptions of oral conversations in the Necco office, and the FBI reactivated its electronic equipment in that office. The equipment was deactivated when the authorized period expired, and later the equipment was removed from the premises.
 
 
 19
 The interceptions effected under the second order, like those effected under the first order, produced evidence that was valuable to the government.
 
 
 20
 Pursuant to 18 U.S.C. § 2518(8)(d), the district court ordered inventories of the interceptions to be served on the persons named in the two authorizing orders and also upon the defendants Becchina, Circo, Sciortino and Simone; the time for serving the inventories was permissibly extended by the district court, and inventories were served on all of the defendants with whom we are concerned within the extended period.
 
 
 21
 On December 8, 1973 the government applied to Judge Collinson for the issuance of search warrants affecting various locations and a number of automobiles and authorizing that the persons of Tousa, Costanza and others be searched. The application was based on another affidavit of Special Agent Schucker, and it was granted by the district court. The premises to be searched were Necco, "The Trap," Picone's home on North Walrond Avenue, the apartment at 545 Prospect Avenue, and the residence at 1740 Cherry Street. The automobiles included those of Tousa and Costanza.
 
 
 22
 The warrants were executed and evidence of illegal gambling operations was discovered and seized. Tousa and Costanza were searched by FBI agents on December 9, 1973 and certain materials were taken from them. Those two defendants were accosted by the agents while the former were sitting in an automobile parked in front of the home of Costanza. The defendants first refused to open the doors of the automobile, and did not do so until one of the agents drew his revolver and threatened to shoot the lock off of one of the doors of the car. After being searched preliminarily at the car, Tousa and Costanza were conducted into the latter's home where they were stripped and searched thoroughly. In the course of the proceedings those defendants were advised of their Miranda rights, but they were not arrested or charged with any offense. When the searches were completed, they were released from restraint.
 
 
 23
 Following the execution of the search warrants, the government continued its investigations and began to present its case to the grand jury. In connection with that presentation the government ran into difficulties. Many of the numerous witnesses called by the government proved to be recalcitrant and had to be granted formal immunity before they would testify at all. One witness, Dominick DiGirlomo, the father of the defendant, Nicholas DiGirlomo, positively refused to testify even though granted immunity, and he was ordered confined as provided by 28 U.S.C. § 1826(a). He appealed, and the order of the district court was affirmed. DiGirlomo v. United States, 520 F.2d 372 (8th Cir.), cert. denied, 423 U.S. 1033, 96 S.Ct. 515, 46 L.Ed.2d 407 (1975).[4] Additionally, the term of the grand jury that had begun to hear the presentation expired, and the presentation had to be completed before a newly empanelled grand jury.
 
 
 24
 In the meantime, Judge Collinson had released the intercepted materials to a federal grand jury sitting in Kansas City, Kansas, and that grand jury returned an indictment charging Vincent Picone, Anthony Simone and Joseph Goodfellow, who were mentioned in the indictment in this case, with having violated 18 U.S.C. § 1952 which makes it an offense for any person to travel in interstate commerce or to use any facility of interstate commerce, including the mail, to distribute the proceeds of any unlawful activity or otherwise to promote, manage, establish or carry on or facilitate the promotion, management, establishment or carrying on of any unlawful activity.
 
 
 25
 The three defendants in that case moved to suppress the evidence that had been obtained against them by means of interceptions authorized by the two orders of Judge Collinson in this case. Goodfellow and Simone claimed that the government had probable cause to believe that they were engaged in the unlawful activities in question, and that their communications would be intercepted, but failed to identify them in the applications and authorizing orders. Picone claimed that evidence of his communications with Goodfellow were tainted because Goodfellow had not been identified. In late 1975 the Kansas district court (District Judge Earl E. O'Connor) sustained the motions of all three of the defendants in that case. United States v. Picone, 408 F.Supp. 255 (D.Kan.1975). A government appeal from that decision is now pending before the Court of Appeals for the Tenth Circuit.
 
 
 26
 We turn now to the individual appeals with which we are concerned.
 
 
 27
 I. The Tousa-Costanza Appeals.
 
 
 28
 The only claim for reversal made by Tousa and Costanza is that the lapse of time between the date of their search in December, 1973 and the return of the indictment in December, 1975 deprived them of due process of law guaranteed by the fifth amendment to the Constitution of the United States and of the right to a speedy trial guaranteed by the sixth amendment and by Fed.R.Crim.P. 48(b). The do not complain that they were denied a prompt or speedy trial after they were ultimately indicted.
 
 
 29
 There is no merit to defendants' claims based on the sixth amendment and on Rule 48(b).
 
 
 30
 A defendant's right to a speedy trial under the sixth amendment does not come into play until after he has actually been accused of crime. United States v. Marion, 404 U.S. 307, 313-20, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); United States v. Jackson, 504 F.2d 337, 338-39 (8th Cir.), cert. denied, 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975). And Rule 48(b) is clearly limited in application to post-arrest situations. United States v. Marion, supra, 404 U.S. at 319, 92 S.Ct. 455, and United States v. Jackson, supra, 504 F.2d at 339.
 
 
 31
 The defendants argue that they were actually "accused" when they were accosted by the agents and searched on December 9, 1973. We do not accept that argument. While it is true that the defendants had their Miranda rights read to them, and while it is also true that they were physically detained for a brief period of time incident to the searches, they were never placed under arrest or charged with any offense; they were not taken before any magistrate; and they were not held to answer to the district court.
 
 
 32
 In our view the sixth amendment's concept of an "accused" person is limited to a person who has actually been charged with a crime or who has been taken into custody pending the filing of formal charges. Dillingham v. United States, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975), cited by the defendants, is of no help to them. That case held simply that a twenty-two month delay between the arrest of an individual and his indictment, which was followed by an additional delay of twelve months in bringing the accused to trial, had to be taken into consideration in determining whether the accused was denied a speedy trial. We do not consider that the episode of December 9, 1973 amounted to an arrest or accusation for purposes of either the sixth amendment or Rule 48(b).
 
 
 33
 Turning now to the fifth amendment claim of the defendants, it is settled that an unreasonable delay in the commencement of a prosecution amounts to a denial of due process of law and calls for a dismissal of the charge where the delay has worked to the substantial prejudice of the defendant in resisting the accusation. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); United States v. Bresley, 548 F.2d 223 (8th Cir. 1977); United States. v. Quinn, 540 F.2d 357 (8th Cir. 1976); United States v. Naftalin, 534 F.2d 770 (8th Cir.), cert. denied, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 89 (1976); United States v. Lovasco, 532 F.2d 59 (8th Cir.), cert. granted, 429 U.S. 884, 97 S.Ct. 233, 50 L.Ed.2d 164 (1976); United States v. Barket, 530 F.2d 189 (8th Cir. 1976); United States v. Jackson, supra.
 
 
 34
 In Jackson we said that resolution of a claim that due process has been denied by an unreasonable preindictment delay involves a balancing of the reasonableness of the delay against the resulting prejudice to the defendant (504 F.2d at 339). To the same effect is United States v. Quinn, supra, 540 F.2d at 360, n. 2. In Jackson we noted (504 F.2d at 339, n. 2):
 
 
 35
 It is often said that unreasonable delay must coincide with prejudice before the due process clause requires reversal and hence many courts, after finding lack of prejudice, refuse to consider the reasons for delay. (Citations omitted.)
 
 
 36
 Since we prefer to view the due process claim as one involving a balancing process, we hesitate to say that prejudice could never be presumed in an outrageous case of unjustified delay. (Citation omitted.) We agree that, at least where the government is not engaging in intentional delay in order to gain a tactical advantage over the accused, the defendant must affirmatively demonstrate prejudice. (Citations omitted.) There is no showing that the government sought such a tactical advantage here.
 
 
 37
 Naturally, the longer the delay between the commission of an offense or the discovery of its commission and the commencement of a prosecution, the greater the likelihood of prejudice either to the defendant or, as is often the case, to the prosecution.
 
 
 38
 In Naftalin, supra, 534 F.2d at 773, we recognized that as delay increased "the specificity with which prejudice must appear, diminishes." And it was suggested in Jackson, supra, that extreme delay may create a presumption of resulting prejudice. Basically, however, the burden of showing prejudice is on the defendant. United States v. Bresley, supra; United States v. Quinn, supra, 540 F.2d at 361.
 
 
 39
 Regardless of the point at which one begins to measure the delay in question, it is obvious that the delay was quite substantial. However, the indictment was returned well within the statutory period of limitations, and there is nothing to suggest that the delay was due to any misconduct or bad faith on the part of government investigators or prosecutors or that it was intentionally designed to prejudice the defendants or to gain any tactical advantage over them. See United States v. Naftalin, supra, 534 F.2d at 774. Some of the difficulties that the government encountered during the preindictment period have been mentioned, and at least some of those difficulties were due to the activities and attitudes of the over-all group of defendants and their associates. Regard must also be had to the fact that during most of 1975 the validity of Judge Collinson's orders as to some individuals was being contested in Kansas, and to the fact that in the Western District of Missouri the term of one grand jury expired and another grand jury had to be called into session.
 
 
 40
 The ultimate question, then, is whether the defendants carried their burden of proof of establishing that the two year delay in question substantially prejudiced them in their defense. The district court in the course of an opinion filed on April 29, 1976, which followed a pretrial hearing on motions that was held on April 7, 1976, answered that question in the negative.
 
 
 41
 In both Lovasco and Barket, supra, the district court had found that the preindictment delay complained of had resulted in prejudice to the respective defendants. This court recognized that those findings must be accepted by this court unless clearly erroneous, and a majority of this court in those cases concluded that the findings of the district court were supported by the evidence and were not clearly erroneous. In Naftalin, on the other hand, the court concluded that the district court's finding of prejudice lacked substantial evidentiary support and was clearly erroneous.
 
 
 42
 The instant case differs from Lovasco and Barket in two important respects. First, in both of those cases the majority of the court thought there was some concrete evidence on which a finding of prejudice could properly be based; here, there is no such evidence. Second, in both of those cases the district courts had found prejudice, and that is not the situation here.
 
 
 43
 In dealing with the question of prejudice the district court said:
 
 
 44
 . . . In their motions to dismiss for preindictment delay, defendants generally allege prejudice in the delay between the alleged commission of the unlawful acts and the return of the indictment. Defendants presented no evidence on this motion during the April 7 hearing. The mere allegation of prejudice will not support a finding of prejudice and, absent a finding of prejudice, "the reasonableness of the delay becomes irrelevant" (citing Naftalin, supra ). The Naftalin court discusses many of the same issues raised by defendants herein, and the motion to dismiss for preindictment delay will be denied based upon the Naftalin opinion. Defendants have requested broad discovery privileges should this motion be denied. By Counsels' admission, defendants have been accorded such privileges. In passing, the Court states that to its knowledge, the Government has been extremely cooperative in this regard. . . .
 
 
 45
 In our view the finding of the district court that defendants had not shown prejudice resulting from the preindictment delay was not clearly erroneous, and we accept it. We will say without elaboration that we are not impressed by the argument of the defendants that they suffered from memory failings on the part of government witnesses; nor are we impressed by the claim of Tousa that had he been tried in this case before he was tried and convicted in the earlier Civella case, he might have taken the stand in his own behalf, but was unwilling to do so in view of the fact that his prior conviction might have been used by the government for purposes of impeachment.
 
 
 46
 The convictions of Tousa and Costanza will be affirmed.
 
 
 47
 II. The Circo, Sciortino and Simone Appeals.
 
 
 48
 These defendants contend that in October and November, 1973 the government had probable cause to believe that their communications while on the premises of Necco would be intercepted, that the failure of the government to identify any of them in the October application and order, and the failure of the government to identify Circo and Sciortino in the November application and order constituted violations of the requirements of 18 U.S.C. §§ 2518(1)(b)(iv) and 2518(4)(a), and that suppression of the interceptions and evidence based thereon was required.
 
 
 49
 They also contend that the district court violated the fourth amendment to the Constitution of the United States, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, and other applicable law, when it authorized government agents to enter the Necco premises secretly or by force, and that the agents were guilty of similar violations when they operated under that particular authorization.
 
 
 50
 The facts relevant to those contentions have been stated and will not be repeated. And we have also mentioned the requirements of the two subsections of the Act upon which defendants rely.
 
 
 51
 The complaints of these defendants and the similar complaints of Becchina, Nicholas DiGirlomo, the Palmenteres, and Gulotta that there had been noncomplaince with §§ 2518(1)(b)(iv) and 2518(4)(a) were the subject of a full evidentiary hearing before the district court.
 
 
 52
 As to Becchina, Circo, Sciortino and Simone the district court found with respect to all of them that in October, 1973 the government did not have such probable cause as to require their identification in the government's first application for interception authority or in the order granting that application. And the district court made the same findings as to Becchina, Circo, and Sciortino with respect to the second application and order. The district court also found that inventories had been timely served on all four of the defendants, a fact which was not disputed. The motions to suppress were denied largely on the strength of our holding in Civella, supra.
 
 
 53
 The district court granted the motions of Nicholas DiGirlomo, Benjamin Palmentere, and Robert Vincent Gulotta on the grounds that timely service of inventories on them had not been effected. And the motion of Joseph George Palmentere, Jr. was sustained on the ground that the government had probable cause as to him that required his identification in the applications and orders.[5]
 
 
 54
 We are satisfied that in determining the issue of probable cause as to the respective defendants the district court employed the proper legal standard, and that its findings as to them were not clearly erroneous.
 
 
 55
 Even if it be assumed, however, that Becchina, Circo, Sciortino and Simone should have been identified in both of the respective orders, we are convinced that they were not prejudiced by the omissions and that suppression of the evidence as to them was not required, particularly since they were served with inventories within the extended time specified by the district court. United States v. Donovan, supra; United States v. Civella, supra.
 
 
 56
 As stated earlier, the defendants complain about that part of the interception order that authorized secret or forcible entry into the Necco premises for the purpose of installing interception equipment. The government says that the complaint is without merit and also argues that the defendants have no standing to raise the question.
 
 
 57
 An electronic interception of communications amounts to a search and seizure for fourth amendment purposes, and since the defendants were rightfully on the Necco premises and had some reasonable expectation of privacy in connection with their conversations while there, we conclude that they possess standing to raise the question now under consideration. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); and United States v. Agrusa, 541 F.2d 690 (8th Cir. 1976).
 
 
 58
 As far as the merits of the question are concerned, the contentions of the defendants do not differ materially from those advanced, considered and rejected in United States v. Agrusa, supra, 541 F.2d at 695-701. That case, although decided by a divided court, presently represents the law in this circuit, and on the strength of it we reject the contentions of the defendants. The same "exigent circumstances" found to exist in the Agrusa case were present here; obviously, electronic equipment could not have been placed effectively in the Necco office unless the action was taken surreptitiously and with at least such nominal force as was necessary for the agents to employ in order to get into the building. We might observe that Anthony Simone owned the building in question and was the head of Necco Tea & Coffee Co.
 
 
 59
 So, the convictions of Circo, Sciortino and Peter Simone will be affirmed.
 
 
 60
 III. The Becchina Appeal.
 
 
 61
 To the extent that Becchina makes the same arguments advanced by Circo, Sciortino and Peter Simone, those arguments will be rejected as to him as they have been with respect to the other three defendants just mentioned.
 
 
 62
 Becchina contends individually that the action of the district court in Kansas suppressing evidence as against the Kansas defendants required the Missouri district court to take the same action with respect to the intercepted communications of Becchina. There is no merit in that contention.
 
 
 63
 Becchina's claim cannot be sustained on the basis of res judicata. He was not a defendant in the Kansas case, and the district court in Kansas was not called upon to decide whether evidence based on Becchina's intercepted communications should be suppressed as to him, and did not purport to do so. All that Judge O'Connor held was that the communications of the Kansas defendants should be suppressed in the Kansas case. In so holding he gave what he considered to be the proper effect to the government's failure to comply strictly with the identification requirements of the Act as to the Kansas defendants. The view that he took was contrary to that taken by this court in Civella, and it may have been contrary to the later holding of the Supreme Court in Donovan, supra.
 
 
 64
 Where the communications of a number of persons are intercepted under a single authorizing order, the mere fact that some interceptees may be entitled to suppression does not mean that all of them are so entitled. Interceptions may be valid as to some interceptees and invalid as to others. See Civella, supra, 533 F.2d at 1402.
 
 
 65
 It is not entirely clear to us whether any of the intercepted communications of Becchina were with the individuals who became defendants in the Kansas case. If they were not, then the fact that evidence of the communications of those defendants was suppressed would seem irrelevant as far as Becchina is concerned.
 
 
 66
 If communications between Becchina and one or more of the Kansas defendants were intercepted, Becchina is confronted with the fact that the district court held, and we hold, that the interceptions were valid as to him regardless of whether they were valid as to other parties to the communications.
 
 
 67
 It may be conceded that interception evidence that is inadmissible as to one of the parties to the intercepted communication may also be inadmissible as to the other. Cf. United States v. Bellosi, 163 U.S.App.D.C. 273, 501 F.2d 833 (1974). We do not think that it is true, however, that interception evidence that is inadmissible against one party to a communication is automatically or necessarily inadmissible against the other.
 
 
 68
 If the communications of one person are subject to interception under a valid court order, we do not think that person is entitled to suppression simply because some other party or parties to the communications may be entitled to suppression as to him or them.
 
 
 69
 In view of what has been said, the appeal of Becchina will suffer the same fate as those of his co-defendants.
 
 
 70
 The judgments of the district court in all of the cases are affirmed.
 
 
 
 *
 The Honorable James H. Meredith, Chief Judge, United States District Court for the Eastern District of Missouri, sitting by designation
 
 
 [1]
 The Honorable William R. Collinson, United States District Judge
 
 
 [2]
 A government appeal from the order of suppression as to those defendants is now pending in this court
 
 
 [3]
 A petition for a writ of certiorari in that case is now pending before the Supreme Court
 
 
 [4]
 At the trial of Tousa and Costanza DiGirlomo was called as a government witness and again refused to testify although he had been immunized. He was jailed for the rest of the trial and was also held in criminal contempt. He appealed, and his case was heard along with those with which we are now concerned. In view of a confession of error by the government with respect to sentencing, we dealt with his appeal rather summarily. United States v. DiGirlomo, 548 F.2d 252 (8th Cir. 1977)
 
 
 [5]
 The record reflects that Joseph George Palmentere was timely served with an inventory of the interceptions of his communications. Thus, there may have been an inconsistency between the district court's ruling as to him and the district court's ruling as to Becchina, Circo, Sciortiono and Simone. That inconsistency, if any, did not in our view prejudice the defendants before us and is immaterial