18 F.3d 541
 UNITED STATES of America, Appellee,
v.
Kenneth D. LUCHT, Appellant.
UNITED STATES of America, Appellee,
v.
Gary D. APKER, Appellant.
UNITED STATES of America, Appellee,
v.
Cheryl M. MORFORD, Appellant.
UNITED STATES of America, Appellee,
v.
Lovella MAUSETH, Appellant.
UNITED STATES of America, Appellee,
v.
Sandra A. VOLKIR, Appellant.
UNITED STATES of America, Appellee,
v.
Lamont D. KRESS, Appellant.
UNITED STATES of America, Appellee,
v.
Rodney S. RUMSEY, Appellant.
UNITED STATES of America, Appellee,
v.
Timothy S. EGAN, Appellant.
UNITED STATES of America, Appellee,
v.
Dale Ray HALEY, also known as Corky Haley, Appellant.
UNITED STATES of America, Appellee,
v.
Mary LEE, also known as Mary Spethman, Appellant.
UNITED STATES of America, Appellee,
v.
Robert T. FARRELL, Appellant.
 Nos. 92-2513, 92-2538, 92-2569, 92-2572, 92-2575, 92-3264,
92-3266, 92-3267, 92-3271, 92-3272 and 92-3785.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1993.
Decided Feb. 28, 1994.
Rehearing Denied April 20, 1994 in No. 92-3271.
Rehearing and Suggestion for Rehearing En Banc Denied April
25, 1994 in No. 92-2569.
 
 Before WOLLMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 These appeals stem from a lengthy investigation of the Omaha Chapter of the Hell's Angels Motorcycle Club and the involvement of that group in a large-scale drug conspiracy. The investigation focused on the activities of defendant Gary Apker, and included first placing a pen register and then a wiretap on Apker's telephone, and subsequently bugging Apker's home. Based in part on information obtained from the wiretap and bugs, search warrants were obtained and executed at nearly all of the defendants' homes. The investigation ultimately resulted in a multi-count superseding indictment, which alleged a conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. Secs. 846 and 841(a)(1) and various substantive crimes committed in furtherance of the conspiracy. Six defendants entered conditional guilty pleas; five were convicted after trial.
 
 
 2
 Defendants appeal the district court's denial of motions to suppress evidence obtained from the wiretap, bugs, and searches, as well as a variety of other issues. We reverse the district court's denial of Lamont Kress's motion to suppress evidence from the search of his home. We affirm on all other issues.
 
 I. Wiretap Evidence
 
 3
 Officer John Car of the Omaha Police Department's special operations squad assisted with the technical operation of the pen register. After Deputy Michael Buglewicz of the Douglas County Sheriff's Department notified Car that he soon expected to have court approval for a wiretap, Car conducted "audio tests" with the pen register for brief periods of time on three consecutive days. He converted the pen register into a listening device in order to check sound quality and test the recording equipment that would be used for the wiretapping. Car destroyed the tape-recorded tests upon completion and did not tell anyone about the content of the conversations he had overheard. Car testified that these audio tests were standard operating procedure before every wiretap and that he had conducted them for the last six years--each time with the knowledge that a court had not authorized the tests.
 
 
 4
 Defendants argue that Car's actions violated the Fourth Amendment and state and federal wiretapping statutes. We agree, as did the district court when it ordered suppression of Car's interceptions. Defendants contend, however, that Car's actions require complete suppression of all evidence obtained from the court-ordered wiretapping. Although we do not condone Car's actions, we do not agree with defendants' asserted remedy. The decision to seek a wiretap order was not prompted by Car's tests, and no information obtained from the tests was presented to the issuing judge. Because the government's later, lawful interceptions under the wiretap order were independent of the earlier, unauthorized interceptions, the evidence obtained under the wiretap order was admissible. See Murray v. United States, 487 U.S. 533, 542, 108 S.Ct. 2529, 2535-36, 101 L.Ed.2d 472 (1988).
 
 
 5
 Defendants also contend that suppression of the wiretap evidence is required because there was a material omission in the affidavit and application in support of the wiretap--namely, the information that Car had conducted unauthorized audio tests. A defendant may challenge a facially sufficient affidavit on the ground that the police included deliberate or reckless falsehoods, Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676-77, 57 L.Ed.2d 667 (1978), or deliberately or recklessly omitted material information. United States v. Reivich, 793 F.2d 957, 960 (8th Cir.1986). For an omission challenge, the defendant must show "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, ... and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." Id. at 961 (citations omitted).
 
 
 6
 Assuming without deciding that facts were recklessly omitted, we conclude that the district court did not err in denying defendants' motion to suppress. The lengthy affidavit and application in support of the wiretap contained information from confidential sources, physical surveillance, and prior investigations of Apker that established probable cause for the belief that Apker and others were engaged in the distribution of and possession with intent to distribute methamphetamine and that particular communications concerning these offenses would be obtained through a wiretap on Apker's telephone. The knowledge of Car's unauthorized testing does not diminish the included facts for probable cause purposes, and thus the affidavit, supplemented with the information concerning Car's testing, remains sufficient to support a finding of probable cause.
 
 II. Oral Communications Evidence
 
 7
 Defendants next argue that the district court should have suppressed all evidence obtained from the bugging of Apker's home because the government violated the oral interception order.[1] Pursuant to 18 U.S.C. Sec. 2518, the court entered an order which stated that there was probable cause to believe that Apker's residence (excluding bathrooms and bedrooms) was being used by Apker and others in connection with narcotics trafficking and money laundering; authorized the interception of oral communications between the individuals concerning the stated offenses, "which conversations occur in the Apker residence (excluding bathrooms and bedrooms)"; and ordered Special Agents of the Federal Bureau of Investigation to "surreptitiously enter the residence (excluding bathrooms and bedrooms) ... and install, repair, and subsequently remove electronic devices capable of intercepting oral communications of and between [the individuals] to effect this Order." The order also required that "all monitoring or oral communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation in accordance with the minimization requirements of Chapter 119 of Title 18 of the United States Code." See 18 U.S.C. Sec. 2518(5).
 
 
 8
 Defendants concede that government agents did not place bugs in Apker's bedrooms or bathrooms. They argue, however, that the order prohibited seizing conversations occurring in these rooms and that government agents became aware during the course of the intercept that they were intercepting sounds from the basement bathroom. At the suppression hearing, defendants introduced a number of tapes containing conversations accompanied by the sounds of a toilet flushing, a person urinating, and the opening and closing of a safe, which agents discovered under the basement bathroom vanity during a search of Apker's home conducted subsequent to the oral interceptions.
 
 
 9
 Title 18 U.S.C. Sec. 2515 provides that the contents of any wire or oral communication, and evidence derived therefrom, may not be received in evidence "if the disclosure of that information would be in violation of this chapter." The specific grounds for suppression are set forth in Section 2518(10)(a):
 
 
 10
 (i) the communication was unlawfully intercepted;
 
 
 11
 (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
 
 
 12
 (iii) the interception was not made in conformity with the order of authorization or approval.
 
 
 13
 18 U.S.C. Sec. 2518(10)(a)(i)-(iii).
 
 
 14
 The district court determined that the violation of the statute did not require suppression, relying on United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); and United States v. Civella, 533 F.2d 1395 (8th Cir.1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977). These cases addressed whether suppression was required for failure to comply literally with particular statutory procedures set forth in Section 2518. See Chavez, 416 U.S. at 570-71, 575, 94 S.Ct. at 1853-54, 1856 (failure to correctly identify individual authorizing application); Giordano, 416 U.S. at 524-25 & nn. 13-14, 94 S.Ct. at 1831-32 (failure to secure approval of one of statutorily specified individuals before making application for judicial authority to wiretap); Civella, 533 F.2d at 1400-06 (failure to submit affidavit described in application, failure to identify certain defendants as persons whose communications would be intercepted, failure to serve inventories on persons named in order within specified time period).
 
 
 15
 We conclude that the "substantial compliance" rationale of Chavez, Giordano, and Civella is not applicable to the present case, for defendants do not assert a failure to conform to the procedural requirements of the statute. They argue that the order--obtained in compliance with statutory procedures and valid on its face--was violated. We construe this as an argument that oral interceptions were not "made in conformity with the order of authorization or approval," 18 U.S.C. Sec. 2518(10)(a)(iii), and we conclude that the minimization analysis of Scott v. United States, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), is appropriate.
 
 
 16
 Given the nature of electronic surveillance, agents can be expected at times to overhear partial or complete conversations that they are not authorized by order to intercept. In order to limit these intrusions and comply with the Fourth Amendment's particularity requirement, the statute requires every order to "contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. Sec. 2518(5); see United States v. Garcia, 785 F.2d 214, 224 (8th Cir.), cert. denied, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986).
 
 
 17
 In Scott, the government established probable cause that nine individuals were using a particular phone in a conspiracy to import and distribute narcotics and obtained a wiretap order that contained a provision requiring minimization. Scott, 436 U.S. at 131-32, 98 S.Ct. at 1720-21. Government agents made no attempt to minimize: they intercepted virtually all conversations, including non-narcotics-related conversations "not otherwise subject to interception." Id. at 132, 98 S.Ct. at 1720. The Supreme Court concluded that suppression was not required. The Court explained that "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." Id. at 140, 98 S.Ct. at 1724. It held that the determination of whether the agents properly minimized depended upon an objective assessment of the agents' actions in light of the facts and circumstances of the case, not upon the agents' subjective intentions. Id. at 135-40, 98 S.Ct. at 1722-24. The Court stated that "[i]n a case such as this, involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." Id. at 142, 98 S.Ct. at 1725. It noted that many of the non-narcotics-related calls were short, some were one-time conversations, and a large number were ambiguous in nature. Id.
 
 
 18
 As in Scott, the investigation in this case focused on a widespread conspiracy, requiring extensive surveillance to determine the precise scope of the enterprise. See id. at 140, 98 S.Ct. at 1724-25. From the start of surveillance, it became apparent that the conversations of conspirators would shift without warning from innocent matters to discussions of illicit operations. Further, from the viewpoint of the agent monitoring the bug, it was impossible to tell where the participants of a conversation were located within the basement at any given time. The sounds of a safe opening and closing are not sounds typically associated with a bathroom and did not indicate that conversations were taking place in the bathroom. Although the monitoring agent might have assumed that one of the participants was in the bathroom when the bug intercepted urination or flushing sounds, these sounds were brief and unexpected and, once finished, did not provide any clue as to the participant's current location.
 
 
 19
 Accordingly, in light of the facts and circumstances of this case, we hold that the agents did not act unreasonably at the time they made these interceptions and that suppression of all evidence obtained from the bugging of Apker's home is not required.
 
 III. Knock and Announce Claims
 
 20
 Search warrants were executed simultaneously at nearly all of the defendants' homes at 7:00 a.m., October 17, 1990. Seven defendants challenge the district court's denial of their motions to suppress evidence seized in the searches.
 
 
 21
 Defendants sought suppression based on law enforcement officials' alleged violations of the "knock and announce" rule set forth in 18 U.S.C. Sec. 3109, which provides in part that an officer may force entry to execute a search warrant, "if, after notice of his authority and purpose, he is refused admittance." The statute does not require an affirmative refusal of admittance, "but encompasses circumstances that constitute constructive or reasonably inferred refusal." United States v. Bonner, 874 F.2d 822, 824 (D.C.Cir.1989).
 
 
 22
 The determination of whether an officer was justified in forcing entry after announcing his presence and purpose does not turn on any hard and fast time limit, but depends upon the circumstances confronting the officer serving the warrant. United States v. Streeter, 907 F.2d 781, 789 (8th Cir.1990). "In reviewing the district court's decision with respect to Sec. 3109, we review the district court's findings of fact for clear error and its application of the law de novo." United States v. Schenk, 983 F.2d 876, 878-79 (8th Cir.1993).
 
 
 23
 We conclude that the district court's findings supported the court's conclusion that officers had been constructively refused admittance at the homes of defendants Rodney Rumsey, Kenneth Lucht, and Sandra Volkir. With respect to Volkir and Rumsey, the court found that their houses were small, the occupants were awake, there was probable cause to believe Volkir and Rumsey possessed narcotics, and the officers waited twenty seconds for a response after knocking and announcing their presence and purpose. In these circumstances, the possibility was slight that those within did not hear or could not have responded promptly, if in fact they had desired to do so. In Lucht's case, the court found that his house was small, the officers twice loudly knocked and announced their presence and purpose, there was probable cause to believe Lucht possessed narcotics, and the officers waited twenty-five to sixty seconds for a response. Although the officers heard nothing to indicate Lucht was awake, they were aware that he was on parole and, therefore, especially sensitive to a knock and announcement for a search. Although Lucht argues that mere silence cannot be construed as access denied, we note that "[r]arely if ever is there an affirmative refusal. More often the officers meet with silence as the occupants seek to destroy evidence or escape." United States v. Ortiz, 445 F.2d 1100, 1102 n. 2 (10th Cir.), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971). We are satisfied that the officers' conduct complied with Section 3109.
 
 
 24
 The district court found that, although officers announced their presence and purpose at the homes of defendants Apker, Dale Ray Haley, and Mary Lee, they did not wait long enough to infer refusal of admittance. Nevertheless, the court concluded that exigent circumstances excused the otherwise improper entries.
 
 
 25
 Exigent circumstances will excuse noncompliance with the knock and announce requirement when the officers, "after considering the particular facts regarding the premises to be searched and the circumstances surrounding the execution of the warrant," reasonably decide there is an urgent need to force entry. United States v. Stewart, 867 F.2d 581, 584 (10th Cir.1989); see United States v. Spinelli, 848 F.2d 26, 29 (2d Cir.1988). The need to force entry may result from danger to the safety of the entering officers or from the imminent destruction of evidence. See Bonner, 874 F.2d at 826. The degree of exigency required to justify a departure from strict compliance with Section 3109 varies with the degree of the departure. Id.
 
 
 26
 We conclude that the circumstances surrounding the execution of the warrants at the homes of Apker, Haley, and Lee were sufficiently exigent to excuse noncompliance with the refusal portion of Section 3109. Through electronic surveillance of Apker's house, officers knew that Apker had completed a drug transaction within hours of the search; he had a hiding place for his drugs which he considered undetectable; and he liked the elevated location of his home because he could survey his surroundings. The officers also knew that weapons had been found in Apker's home on two previous searches; he had a prior conviction for being a felon in possession of a firearm and a prior arrest for assault with a firearm; and he had a motion detector outside of his house. In addition, the officers were in a precarious position--standing on an outside raised wooden porch and stairway fully exposed to overlooking windows--and decided to force entry after waiting five-to-ten seconds after announcing their presence and purpose.
 
 
 27
 The officers that executed the warrant at Haley's house also were in a difficult tactical situation--bunched together on Haley's enclosed porch. After announcing their presence and purpose, they waited six-to-eight seconds and forced entry. The officers knew that Haley had an extensive criminal record that included a weapons violation; he was currently on parole; and he was suspected of consummating a drug transaction within the last twenty-four hours.
 
 
 28
 Lee answered the door when Officer Patricia Gentleman knocked. Lee froze when the rest of the team of officers joined Gentleman on the porch, announced their presence and purpose, and ordered Lee to let them in. From her position on the porch, Gentleman noticed a man inside the house walk from the hallway to the stair landing, turn around, and walk more quickly back down the hallway. Gentleman knew the search warrant was for drugs and was concerned that the man was going for weapons. She pushed her hand through the screen door, unlocked it, and opened it. Given these facts, we agree with the district court that exigent circumstances existed to excuse noncompliance with the statute.
 
 
 29
 The district court found that the officers announced their presence, but not their purpose, at Lamont Kress's house and that they did not wait long enough to infer refusal of admittance. The court concluded that the officers' announcement of their purpose would have been a "useless gesture" and that exigent circumstances justified the manner of entry. We conclude, however, that the "useless gesture" exception does not apply to the facts surrounding the entry into Kress's home. We further conclude that the circumstances surrounding the execution of the warrant were not sufficiently exigent to excuse noncompliance with Section 3109's announcement of purpose and refusal of admittance provisions.
 
 
 30
 FBI Agent James Hauswirth chose to employ the Omaha Police Department's Emergency Response Unit (ERU) to make the initial entry into Kress's home. He was in a car a block away at the time of entry and had left up to ERU the determination of how entry would be made. Robert Frock, ERU team leader, testified that he assumed this to be a high risk situation because ERU was being used. He did not see or have possession of the search warrant or supporting affidavit. Hauswirth had told him that the search warrant was for methamphetamine, there was a likelihood weapons would be present, weapons were found in a 1981 search of Kress's house, and Kress's wife and two teenage daughters possibly would be in the house. Frock testified that he knew that Kress was a suspected Hell's Angel and had reason to believe Kress had anti-police sentiments, but he was not aware of any charges against Kress for assaulting a police officer or of any incidents in Omaha where any member of the Hell's Angels Motorcycle Club attacked an officer. He further testified that he understood the search was for a large amount of methamphetamine, but that this did not alter how he entered the home as compared to any other narcotics situation.
 
 
 31
 Prior to the search, Frock drove past Kress's house and made a diagram of its exterior. He also held a meeting with ERU team members on the morning of the search. They planned to use a crowbar to open the screen door and a one-man battering ram to break down the front door. In a subsequent meeting, Hauswirth explained to Frock that the officers were required to knock and announce before making entry. Frock then instructed his team to knock, wait three-to-five seconds, and make entry with the ram. At Kress's house, the ERU team, dressed in black uniforms with face masks and armed with shields and semi-automatic pistols and rifles, knocked and yelled "police officers." They heard no noise or movement from inside the house and, after three-to-five seconds, entered using the ram.
 
 
 32
 The district court found that the officers had announced their presence and concluded that the "useless gesture" exception excused their failure to announce their purpose. This exception excuses announcement of purpose when it would constitute a useless gesture "because the 'facts known to [the] officers ... justify them in being virtually certain the [persons to be apprehended] already know[ ] their purpose.' " United States v. Tracy, 835 F.2d 1267, 1270 (8th Cir.) (police observed drug house being fortified to prevent entry by police and "lookouts" monitoring surrounding area), cert. denied, 486 U.S. 1014, 108 S.Ct. 1750, 100 L.Ed.2d 212 (1988) (quoting Miller v. United States, 357 U.S. 301, 310, 78 S.Ct. 1190, 1196, 2 L.Ed.2d 1332 (1958)); see United States v. Kulcsar, 586 F.2d 1283, 1285-1286 & n. 4 (8th Cir.1978) (federal agents observed defendant, who had recently completed narcotics transaction, duck out of sight when he saw them approaching). The ERU team did not see or hear anything that would justify them in being virtually certain that Kress knew they were there to execute a search warrant.
 
 
 33
 The district court also concluded that exigent circumstances justified the manner of entry into Kress's home. The court found exigent circumstances because the house was small, it did not have any shades or curtains covering the front windows, the view from the house to the street was unencumbered, the search warrant indicated there was probable cause to believe that large amounts of methamphetamine, cash, and weapons were present, and all the inhabitants were awake. The court concluded that this information, together with the information known to Hauswirth and Frock at the time of entry, justified a quick entry.
 
 
 34
 The proper inquiry is whether, given the facts and circumstances known to Frock, he reasonably decided there was an urgent need to force entry. What Hauswirth knew, aside from what he communicated to Frock, is not relevant to the determination: he was not present at the time of entry and he had left the manner of entry to Frock's discretion and determination. Further, facts that became known only after entry, i.e., that the inhabitants were awake, cannot justify the decision to force entry.
 
 
 35
 We appreciate the fact that Frock assumed this was a high risk situation because ERU was employed. However, a decision to force entry cannot rest on an assumption. It requires consideration of the particular facts and circumstances surrounding the execution of the warrant. Here, ERU was not in a dangerous tactical situation.[2] They did not hear or see anything to indicate they were in danger or that evidence was being destroyed. Frock knew that there was a likelihood that there were weapons in the house, but he had no information indicating that Kress was considered dangerous or violent or might be inclined to use the weapons against them. See United States v. Marts, 986 F.2d 1216, 1217-18 (8th Cir.1993) (reasonable belief firearms may have been within residence, standing alone, clearly insufficient for exigent circumstances). Frock's belief that Kress had a propensity for anti-police sentiments was not based on any particularized knowledge. In fact, Kress's criminal record consisted of a nine-year-old misdemeanor drug possession conviction and a thirteen-year-old charge for carrying a concealed weapon for which prosecution was declined. Frock also knew that the search was for a large amount of methamphetamine, but he testified that this did not alter how he entered the house. There was no evidence that Kress could have easily disposed of a large quantity of drugs or that, like Apker, he had a special hiding place for them. Cf. United States v. Moore, 956 F.2d 843, 850 (8th Cir.1992) (blanket rule permitting no-knock search warrants in all drug cases, regardless of whether forms and quantities suspected to be present can be readily destroyed, patently unjustifiable).
 
 
 36
 Accordingly, we reverse the order denying Kress's motion to suppress the evidence seized during the search of his home.
 
 IV. Sufficiency of the Evidence
 
 37
 Defendants Timothy Egan and Haley challenge their conspiracy convictions, contending that the evidence was insufficient to establish that they knowingly became a part of the conspiracy.
 
 
 38
 When considering a sufficiency-of-evidence question, we view the evidence in the light most favorable to the verdict and accept all reasonable inferences supporting the conviction. United States v. Ivey, 915 F.2d 380, 383 (8th Cir.1990). "We reverse only if we conclude that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." Id.
 
 
 39
 In order to convict a defendant of conspiracy, "the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy." United States v. Rogers, 982 F.2d 1241, 1244 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 3017, 125 L.Ed.2d 706 (1993). "Once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement." Ivey, 915 F.2d at 384.
 
 
 40
 Viewed in the light most favorable to the government, the evidence at trial established that Egan and Haley were voluntary and willing participants in the conspiracy. The search of Egan's home revealed sixty grams of methamphetamine, as well as Inositol powder, a scale, and a loaded handgun. From listening to the intercepted conversations between Egan and Apker, the jury could have rationally determined that Apker fronted drugs to Egan for distribution and that Egan advised Apker about laundering money. During one conversation, Egan requests a $10,000 loan from Apker and indicates that he knows he's "a lot farther than you want me to be, and all those kinds of things." In another, when Apker expresses concern over a potential change in currency, Egan assures him that he "stay[s] on top of it" and that "we'll have plenty of time to launder what we've got." Egan also states that his banker friends will "clean up a hundred grand a pop for us." Apker also discusses his problems with receiving small bills from Haley, and Egan asserts, "Oh, man. I've never, I've never done that to you," and relates how he trades small bills for larger ones at a bar. Although Egan's explanation of the government's evidence implies that we should consider the evidence in the light most favorable to him, it was for the jury to accept or reject his testimony and that of his witnesses.
 
 
 41
 Intercepted conversations also implicate Haley as an active participant in the conspiracy. In one conversation Haley asks Apker, "Is this that white shit? Does it stink?" Apker replies, "I don't know. It's in a sealed bag." They proceed to discuss problems with Apker's drug distribution business, including problems with his being paid with small bills. Haley states, "I, I don't, yeah, I'll just pay ya, I can't give ya big bills," and later asserts "Gary, I'll fuckin' help you do anything you need." Apker also engaged in conversations with Egan and Kress about problems with Haley "trying to get another one" without paying for the last, "standing [Apker] on [his] head for ... four or six thousand," and paying in small bills.
 
 
 42
 Given this evidence, we conclude that there is ample support for Egan's and Haley's convictions on the conspiracy count.
 
 V. Jury Instructions
 
 43
 Lee and Rumsey argue that the district court erred in refusing to give a requested jury instruction concerning multiple conspiracies because the evidence showed that some defendants obtained wholesale amounts of methamphetamine from Apker while others obtained retail amounts. A multiple conspiracy instruction should only be given if there is evidence to support a finding of multiple conspiracies. United States v. Spector, 793 F.2d 932, 935 (8th Cir.1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987); see Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, Sec. 5.06G, Notes on Use (1992). Here, the evidence established one conspiracy, centered around Apker as its supplier, with one criminal objective: to distribute methamphetamine in the Omaha area. See United States v. Baker, 855 F.2d 1353, 1357 (8th Cir.1988), cert. denied, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). "The fact 'that a number of separate transactions may have been involved ... does not establish the existence of a number of separate conspiracies.' " Spector, 793 F.2d at 935 (quoting United States v. Brewer, 630 F.2d 795, 799 (10th Cir.1980)).
 
 
 44
 Rumsey also argues that the court erred in refusing to give his requested theory of defense instruction. Although a criminal defendant is entitled to a theory of defense instruction if his request is timely, the evidence supports his instruction, and his instruction correctly states the law, he is not entitled to a particularly-worded instruction. United States v. Long, 977 F.2d 1264, 1272 (8th Cir.1992). Rumsey's proposed instruction, in addition to being lengthy and argumentative, emphasized certain facts in the record and stated that his membership in the conspiracy was not established merely by evidence that he obtained methamphetamine for his own personal consumption, made isolated distributions of methamphetamine, or possessed methamphetamine with intent to distribute. The district court's instruction stated in part that "merely distributing Methamphetamine or merely buying, obtaining, or receiving Methamphetamine for personal consumption, or merely possessing Methamphetamine with intent to distribute does not, in and of itself, prove that a person has joined in an agreement or understanding." We conclude that this instruction adequately and correctly covered the substance of Rumsey's requested instruction and did not limit Rumsey's ability to argue his innocence.
 
 VI. Severance
 
 45
 Egan argues that the district court erred in refusing to grant his motion for severance.[3] He asserts that he was prejudiced by the cumulative effect of the evidence against his codefendants.
 
 
 46
 The joinder of defendants under Federal Rule of Criminal Procedure 8(b) is appropriate when all defendants charged in an indictment are part of a single conspiracy. United States v. Massa, 740 F.2d 629, 644 (8th Cir.1984), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). However, the district court may order separate trials if, in the exercise of its sound discretion, it believes undue prejudice would result from a joint trial. See id.; Fed.R.Crim.P. 14. We will not reverse a district court's refusal to grant severance absent a showing of clear prejudice that indicates an abuse of discretion. United States v. Akers, 987 F.2d 507, 512 (8th Cir.1993).
 
 
 47
 We conclude that the district court did not abuse its discretion in denying Egan's motion to sever, because a joint trial was not unduly prejudicial. The court specifically instructed the jury to treat each defendant separately, and Egan has not shown that the jury was unable to compartmentalize the evidence against him. See id.
 
 
 48
 Egan also argues that the district court wrongly joined the defendants because, if he had been tried separately, Haley would have testified regarding the innocent nature of their relationship. According to Haley's affidavit, he would testify that a taped discussion between Egan and Apker about money Haley owed Egan referred to the balance owing on a car Haley had purchased from Egan. Haley attested that if Egan were granted a separate trial, he would testify to the above, "providing appropriate limitations are placed upon plaintiff's cross-examination."
 
 
 49
 To obtain severance on the ground that a codefendant will testify favorably, a defendant must show that the codefendant is likely to testify at a separate trial and that the testimony would substantially exculpate him. United States v. DeLuna, 763 F.2d 897, 920 (8th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). The district court concluded that, even assuming Haley's testimony would otherwise exculpate Egan, it was not likely that Haley would in fact testify because the court could not give him the assurances he sought regarding "appropriate limitations ... on cross-examination."
 
 
 50
 "Where an offer to testify if trials are severed is conditional, the court does not abuse its discretion by denying the motion." United States v. Jagim, 978 F.2d 1032, 1040 (8th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2447, 124 L.Ed.2d 664 (1993). Haley's offer was conditional: his willingness to testify was contingent on the court's willingness to place limits on the government's ability to cross-examine him. The court could not give such assurances and, consequently, Egan could not show that Haley was likely to testify in a separate trial. Therefore, we conclude that the district court did not abuse its discretion in refusing to grant severance. See United States v. Funt, 896 F.2d 1288, 1298 (11th Cir.1990) (affirming district court's refusal to grant severance where codefendant offered to testify only if court made favorable rulings on scope of cross-examination).
 
 VII. Sentencing
 A. Base Offense Level
 
 51
 Egan, Rumsey, Lee, and Haley argue that the district court erred in determining the quantity of drugs attributable to them in calculating their base offense levels. A jury found each of these defendants guilty of one count of conspiracy, as well as of twenty-five substantive counts of distribution and possession with intent to distribute methamphetamine. The court instructed the jury on each substantive count that to find a defendant guilty of that count, it had to find that the defendant was a member of the conspiracy at the time of the illegal activity described in the count and that the illegal activity was done in furtherance of the conspiracy, fell within the scope of the conspiracy, and could have been reasonably foreseen as a necessary or natural consequence of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (coconspirator vicariously liable for any other crime his coconspirators committed in course of and in furtherance of conspiracy as long as defendant could reasonably have foreseen his coconspirator might commit crime).
 
 
 52
 The district court found each defendant accountable for 5.98 kilograms of methamphetamine, representing the aggregate amount of methamphetamine involved in the substantive counts of conviction as established by intercepted conversations and, in the case of one count, by drugs seized from Apker's house. The court held that the government had not proved by a preponderance of the evidence its contention that an additional 55.37 kilograms--an estimated quantity based upon $232,000 in cash seized from Apker's house--should be attributed to the conspiracy.
 
 
 53
 Defendants argue that the court failed to make findings regarding the scope of the criminal activity jointly undertaken by each of them and the foreseeability of the conduct of others in connection with that criminal activity as required by U.S.S.G. Sec. 1B1.3. This argument ignores the fact that the jury made these findings when it found each defendant guilty of the substantive offenses and that, under the Guidelines, the sentencing court properly could aggregate the amounts involved in these counts of conviction in order to determine defendants' base offense levels. See U.S.S.G. Sec. 3D1.2(d) (grouping closely-related counts of conviction) and Sec. 3D1.3(b) (offense level applicable to group is offense level corresponding to aggregate quantity). Accordingly, we reject the attack upon the district court's quantity-determination finding.
 
 B. Weapon Enhancements
 
 54
 Egan, Mauseth, and Rumsey argue that the district court erroneously enhanced their base offense levels for possessing firearms during the course of a drug offense.[4] Section 2D1.1(b)(1) provides for a two-level increase if a firearm was possessed during the commission of the crime. Application Note 3 states in part that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." We will not reverse the district court's findings that defendants possessed firearms for the purposes of 2D1.1(b)(1) unless they are clearly erroneous. See United States v. Luster, 896 F.2d 1122, 1128 (8th Cir.1990).
 
 
 55
 The weapons at issue were discovered during the searches of defendants' homes. Law enforcement officers seized a loaded handgun located near 60 grams of methamphetamine, Inositol, and a triple beam balance scale at Egan's house. They seized a loaded revolver from Mauseth's trailer home, located across the room from 30 grams of methamphetamine. Officers seized eight handguns from Rumsey's house, along with methamphetamine residue, drug paraphernalia, ammunition, an Acculab Model 333 scale, and $6,000 cash. A revolver was located on a night stand next to Rumsey's bed and a fully loaded semi-automatic .22 caliber firearm was found under his bed. We hold that the district court did not clearly err in finding that a sufficient nexus existed between the drugs and the firearms to support the two-level enhancements.
 
 
 56
 Rumsey argues that the district court erroneously placed the burden on him to prove the factual prerequisite to his sentence enhancement when the court stated: "It has not been clearly shown by a preponderance that it is clearly improbable that the weapon was connected with the offense." The government bears the burden of establishing by a preponderance of the evidence that the weapon was present and that it was not clearly improbable that the weapon had a nexus with the criminal activity. United States v. Bost, 968 F.2d 729, 732 (8th Cir.1992). Although the district court's statement could be interpreted as a misallocation of the burden of proof to defendant, we hold that any error was harmless given the overwhelming evidence supporting the enhancement.
 
 C. Role in the Offense
 
 57
 Lee, Egan, Morford, and Mauseth assert that they were entitled to reductions in their offense levels based upon their mitigating roles in the offense. See U.S.S.G. Sec. 3B1.2.
 
 
 58
 The sentencing court's determination of a participant's role in the offense is a factual finding subject to the clearly erroneous standard of review. United States v. Nelson, 988 F.2d 798, 809 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 302, 126 L.Ed.2d 250 (1993). The district court did not clearly err in finding that Lee and Egan were not among the "least culpable" of those involved or "less culpable" than most other participants. See U.S.S.G. Sec. 3B1.2, comment. The jury found Lee and Egan guilty on the same count of conspiracy and twenty-five substantive counts as their coconspirators who went to trial.
 
 
 59
 Pursuant to plea agreements, Mauseth and Morford entered conditional guilty pleas and the government conditionally dismissed the superseding multi-count indictment as it pertained to them. Mauseth pled guilty to a one count Information charging her with conspiracy to distribute and possession with intent to distribute 400 grams to 1 kilogram of methamphetamine. Morford pled guilty to a one count Information charging her with conspiracy to distribute and possession with intent to distribute 80 to 100 grams of methamphetamine. At sentencing, the court denied Mauseth and Morford downward adjustments for mitigating roles in the offense. The court held that these defendants were not minor or minimal participants in the crimes of conviction upon which their base offense levels were calculated. It noted that under their plea agreements, Mauseth and Morford were allowed to plead guilty to the amount of controlled substances with which they were directly involved and were not held accountable for the total amount of drugs involved in the conspiracy.
 
 
 60
 Mauseth and Morford contend that the court erred in not taking into account the activities of the larger conspiracy charged in the superseding indictment in deciding whether they were minor or minimal participants. We hold that the district court correctly applied the Guidelines. Although the determination of a defendant's role in the offense is to be made on the basis of all relevant conduct and not solely on the act cited in the count of conviction, "[i]f a defendant has received a lower offense level by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct, a reduction for a mitigating role ... ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense." U.S.S.G. Sec. 3B1.2, comment. (n. 4) (Nov. 1992) (clarifying U.S.S.G. Ch. 3, Pt. B, intro. comment (Nov. 1991)).
 
 
 61
 Here, the sentencing court did not take the larger conspiracy into account in establishing defendants' base offense levels.
 
 
 62
 To take the larger conspiracy into account only for purposes of making a downward adjustment in the base level would produce the absurd result that a defendant involved both as a minor participant in a larger distribution scheme for which she was not convicted, and as a major participant in a smaller scheme for which she was convicted, would receive a shorter sentence than a defendant involved solely in the smaller scheme.
 
 
 63
 United States v. Olibrices, 979 F.2d 1557, 1560 (D.C.Cir.1992). We note that taking the larger conspiracy into account in setting defendants' base offense levels and awarding them the maximum four-level reduction for minimal roles would have likely produced the unfortunate result (at least in defendants' view) of increasing their offense levels and sentencing range exposures.
 
 D. Acceptance of Responsibility
 
 64
 Lee contends that she is entitled to a two-level reduction for acceptance of responsibility under U.S.S.G. Sec. 3E1.1 because she expressed post-trial remorse for her actions in a one-paragraph statement included in her Revised Presentence Report. Lee's contention is without merit. The acceptance of responsibility reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. Sec. 3E1.1, comment. (n. 2).
 
 
 65
 We have considered the remainder of defendants' arguments, and we find that they are without merit.
 
 
 66
 For the reasons stated, we reverse the district court's order denying Lamont Kress's motion to suppress evidence seized during the search of his home and remand his case to the district court for further proceedings. As to all other issues raised by the defendants, we affirm the district court.
 
 
 
 [1]
 The government argues that not all defendants have standing to raise this issue. Because at least defendant Apker has standing, and our analysis would be the same as to all other defendants, we need not decide the question. See Scott v. United States, 436 U.S. 128, 136 n. 10, 98 S.Ct. 1717, 1723 n. 10, 56 L.Ed.2d 168 (1978)
 
 
 [2]
 We note that the district court erred in finding that there were no curtains or shades covering the front windows and that there was an unobstructed view of the street. Although defense counsel introduced at the suppression hearing a videotape of the Kress's house without shades or curtains, the undisputed testimony was that the tape was made shortly prior to the hearing and that there were curtains and blinds in place at the time of the search
 
 
 [3]
 Defendants Rumsey and Haley did not separately brief this issue, but "incorporated" Egan's argument. Defendants are required to show that they were prejudiced by the denial of a separate trial. This is a fact-related issue not subject to incorporation by reference. By failing to argue how they were individually prejudiced, Rumsey and Haley have waived this issue on appeal. See United States v. Simmons, 964 F.2d 763, 777 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992)
 
 
 [4]
 In light of our reversal of the denial of Kress's motion to suppress and our remand to the district court, we do not address Kress's arguments regarding his sentence