# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1312

_____

United States of America,      *
                                  *

         Plaintiff - Appellee,      *
                                  *   Appeal from the United States

     v.                             *   District Court for the Southern
                                  *   District of Iowa.

Larry Rennie Stropes,      *
                                  *

         Defendant - Appellant.      *

_____

Submitted: June 17, 2004
Filed: October 28, 2004

_____

Before BYE, BOWMAN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Defendant-Appellant Larry Rennie Stropes appeals the district court's[1] refusal to grant a hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). He also appeals the district court's determination that officers who executed the search warrant made a legal forcible entry into his home. We affirm.

_____

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

I.

Mr. Stropes sought a <u>Franks</u> hearing because an officer omitted relevant information from a search warrant application. The omitted information related to the credibility of an informant, Elvin Blakely ("Mr. Blakely"). Accordingly, we begin our recitation of the facts with background information about Mr. Blakely.

Cedar County Sheriff's Deputies investigated a burglary at the residence of Mr. Blakely's cousin, Buford Blakely. They discovered that burglars stole multiple firearms. Buford Blakely suggested Mr. Blakely as a suspect because Mr. Blakely used to live with him, asked him for money earlier on the day of the burglary, and recently posted bond from jail. The deputies verified that Mr. Blakely was recently in jail in neighboring Muscatine County following an arrest for interference with official acts, going armed with intent, and possession with intent to deliver a controlled substance. They also verified that he was out on bond.

The next day, police officers in the City of Muscatine responded to a report of a suspicious person with a shotgun case. The officers arrested Mr. Blakely, who carried two shotguns and a rifle identified as stolen from Buford Blakely. The officers called in a detective, Detective Quinn, and told him of Mr. Blakely's arrest. At about 10:15 p.m., Det. Quinn met with Mr. Blakely. At the meeting, Det. Quinn noted that Mr. Blakely slurred his speech. Det. Quinn asked if Mr. Blakely had been drinking. Mr. Blakely said that he had not been drinking but admitted that he had taken some pills and was tired. Mr. Blakely claims to have been sound asleep at the beginning of his first meeting with Det. Quinn.

Det. Quinn gave Mr. Blakely his Miranda warnings and asked him about a prior car stereo theft in Muscatine. Mr. Blakely denied involvement with that theft but said he saw another man with the stolen stereo. Regarding the guns, Mr. Blakely first claimed he bought them from an unknown man at his girlfriend's trailer for $200.

He later claimed he bought them from a known burglar. Still later he claimed that the man he named as the stereo thief stole the guns and sold them to him. Finally, he admitted that he went to his cousin's home with the stereo thief, stole the guns himself, and gave some of the guns to Mr. Stropes as payment for a drug-related debt. During the interview, Det. Quinn repeatedly challenged the truthfulness of Mr. Blakely's statements and questioned his ability to separate fact from fiction. At one point before giving his final version of the facts, Mr. Blakely asked if he could "cut a deal."

Det. Quinn then contacted the Cedar County Sheriff's Department to interview Mr. Blakely about the burglary. A Cedar County Sheriff's Deputy, Deputy Fitch, arrived in Muscatine. Det. Quinn told him of the earlier interview. Deputy Fitch conducted a recorded interview with Mr. Blakely. Mr. Blakely gave Deputy Fitch the same final version of the facts, namely, that he was one of the burglars at his cousin's residence and that he gave some stolen guns to Mr. Stropes as payment for a drug-related debt.

At about 1:15 a.m., Det. Quinn contacted Officer Jirak of the Muscatine Drug Task Force. Det. Quinn relayed the evening's events and the stories that Mr. Blakely told earlier that night. Det. Quinn then obtained from Mr. Blakely and gave to Officer Jirak a handwritten, notarized statement that contained Mr. Blakely's final version of the facts.

Officer Jirak prepared an affidavit to apply for a warrant to search Mr. Stropes's residence for guns. In the affidavit, he did not mention that Mr. Blakely initially lied to officers and repeatedly changed his story. Also, he did not mention Mr. Blakely's prior arrest on charges of interference with official acts, going armed with intent, and the controlled substance offense. Finally Officer Jirak did not mention that Mr. Blakely slurred his speech, appeared tired, and admitted that he had taken pills before his police interviews.

In the affidavit Officer Jirak did describe Mr. Blakely's involvement in the burglary, possession of the stolen firearms, confession to the burglary, and implication of Mr. Stropes. In addition, he wrote, "Blakely stated that Stropes came out to [Mr. Blakely's] residence . . . and retrieved the known stolen items. Blakely describes Stropes['s] residence as being located near Scott's Outdoors in Muscatine[,] Iowa." Officer Jirak claimed in the affidavit that officers verified the exact address of Mr. Stropes's residence and verified that it was in the general area of a convenience store named Scott's Outdoors. Finally, Officer Jirak wrote that Mr. Stropes was the brother of Mr. Blakely's girlfriend, Crystal Stropes.

Officer Jirak provided, as attachments to the application, a Cedar County incident report and Mr. Blakely's handwritten, notarized statement. The Cedar County incident report described the interview of Buford Blakely in which Buford Blakely listed the items stolen and named Mr. Blakely as a suspect. Buford Blakely's description of his own stolen guns matched Mr. Blakely's description of the guns that Mr. Stropes received. The attachment also reported Deputy Fitch's interview of Mr. Blakely.

Officer Jirak obtained a warrant based on the affidavit. He, Det. Quinn, and four other officers executed the warrant at 5:40 a.m. Uncontested testimony established that Officer Jirak knocked three times on Mr. Stropes's door and simultaneously announced "police, search warrant." Officer Jirak estimated that he waited approximately five seconds between each knock and approximately fifteen seconds after the final knock before he gave one of the accompanying officers the order to batter the door for entry. Four officers entered the house, one remained in front of the house, and one remained in the rear. Neither of the outside officers saw anyone leave the house during the search.

Once in the house, Officer Jirak encountered Mr. Stropes rising from bed in a room near the front door. Officer Jirak placed him on the floor and handcuffed him.

Some of the other officers searched the house. They discovered a gun case that held several rifles and ammunition. None of the rifles were the stolen guns, and the officers did not seize any of the rifles in the case. One of the officers encountered Mr. Stropes's wife in the kitchen. She admitted that she had just finished smoking cocaine and that she used cocaine daily. In addition, she disclosed to the officer the location where she kept drugs in the house. The officers held her in custody only until completion of the search.

While officers continued with the search, Det. Quinn advised Mr. Stropes of his Miranda rights. Mr. Stropes then admitted that he received nine guns from Mr. Blakely that he believed to be stolen. During this interview, other officers discovered marijuana and methamphetamine. After completion of the initial search, officers obtained another search warrant to enable a further search for drugs. The application for the second search warrant contained additional information related to the discovery of drugs during execution of the first warrant. Also, Mr. Stropes signed a "voluntary consent to search and seize" form prior to a second search. During the second search, officers found and seized the stolen guns and approximately 200 grams of amphetamine.

The United States charged Mr. Stropes with possession with intent to distribute amphetamine and amphetamine purported to be methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), possession and use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c), and possession of stolen firearms in violation of 18 U.S.C. § 922(j). Mr. Stropes filed a motion to suppress the fruits of the search under Franks, 438 U.S. at 164-65, and requested a hearing. He also contested the officers' forcible entry and moved for suppression of the fruits of the search. The district court denied a Franks hearing, denied the motion to suppress, but referred the forcible entry issue to a magistrate judge for a hearing.

At the hearing, Officer Jirak testified that he knew there was a high probability that there were drugs and guns in Mr. Stropes's residence. In addition, he claimed he was concerned for the officers' safety because Mr. Stropes's sister was Mr. Blakely's girlfriend, and she might have told Mr. Stropes about Mr. Blakely's arrest. Officer Jirak did not have any knowledge concerning contact between Mr. Blakely and Ms. Stropes. No officers claimed that they saw lights or movement in the residence in the early morning before their forced entry. All officers testified that Officer Jirak knocked and announced. At least one of the officers provided an estimate of the time between the knocks and between the knock and entry that closely matched Officer Jirak's estimate. No officers contradicted these estimates. The magistrate judge found "overwhelming evidence" that the officers knocked and announced prior to their forcible entry. However, because there was no specific evidence to suggest Mr. Stropes might be violent and because the evidence (rifles) could not be easily destroyed, the magistrate judge found there to be no exigent circumstances. Ultimately, the magistrate recommended that the district court find the forcible entry unreasonable and grant the motion to suppress.

The district court accepted the magistrate judge's findings regarding the sufficiency of the knock and announce, but rejected the magistrate judge's recommendation to suppress. The district court specifically found that it is not necessary to reach the issue of exigent circumstances when there is a specific finding that officers satisfied the knock and announce requirement. Mr. Stropes then pled guilty, but reserved his right to appeal the Franks and forcible entry issues. We affirm.

II.

We review the district court's refusal to grant a Franks hearing for abuse of discretion. United States v. Fairchild, 122 F.3d 605, 610 (8th Cir. 1997). "[T]he common-law knock-and-announce requirement . . . is part of the reasonableness

inquiry under the Fourth Amendment." United States v. Goodson, 165 F.3d 610, 614 (8th Cir. 1999) (internal citations and quotation marks omitted). We review the district court's legal determinations surrounding the forcible entry issue de novo. United States v. Lucht, 18 F.3d 541, 549 (8th Cir. 1994). Mr. Stropes does not challenge the district court's factual findings regarding the officers' knock-and-announce entry.

Under Franks, if an officer omits critical information from a search warrant application and obtains a warrant, the resultant search may be unreasonable under the Fourth Amendment. Franks, 438 U.S. at 164-65. "To prevail on a Franks claim based on omissions of fact, [a defendant] must prove first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002). In other words, the defendant must show "that the alleged omission[s] would have made it impossible to find probable cause." United States v. Mathison, 157 F.3d 541, 548 (8th Cir. 1998).

Here, the affidavit omitted certain information that Officer Jirak possessed at the time he prepared the affidavit. In particular, Officer Jirak failed to note that Mr. Blakely spoke with slurred speech and admitted that he took pills earlier in the evening; that Mr. Blakely initially lied to officers about the stolen firearms; that criminal charges were pending against Mr. Blakely regarding interference with official acts; and that Det. Quinn questioned Mr. Blakely's ability to separate fiction from fact. These omissions did not make the affidavit misleading because even if the omitted information had been included, there would have remained "a fair probability" that stolen firearms were in Mr. Stropes's residence. See Illinois v. Gates, 462 U.S. 213, 238 (1983) (stating that probable cause exists where there is "a fair probability that contraband or evidence of a crime will be found in a particular place").

We agree with all the arguments the district court set forth to support this conclusion. First, Mr. Blakely made a statement against his own penal interest related to criminal activities beyond the investigation. He admitted that he gave Mr. Stropes stolen guns to pay a drug debt even though the ongoing investigation related solely to a burglary. Such a statement carries considerable reliability because Mr. Blakely took responsibility for actions unrelated to the burglary investigation rather than "merely trying to blame someone else for his own crimes." United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see also United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996).

Second, the omission of Mr. Blakely's initial false statements to the investigating officers and the omission of Mr. Blakely's criminal record did not make the affidavit misleading. The affidavit showed that the Muscatine County Jail recently released Mr. Blakely on bond, and officers arrested him carrying stolen weapons. Judicial officers asked to sign warrants understand that criminal suspects often have criminal records and frequently are uncooperative or untruthful before they eventually cooperate and provide truthful admissions. Allen, 297 F.3d at 796. Accordingly, the omission of this information did not make the application misleading.

Third, Mr. Blakely's desire to "cut a deal" and his ability to create a handwritten confession demonstrate that he understood the interrogation that took place and was able-minded when, finally, he confessed. Mr. Blakely's earlier sleepiness, slurred speech, and admitted use of pills does not detract from the reliability of the information he provided later, when he was lucid. Accordingly, Officer Jirak's failure to mention Mr. Blakely's sleepiness, slurred speech, and use of pills cannot be viewed as fatally prejudicial to the affidavit. Finally, the application contained additional assurances of reliability because officers corroborated the location of Mr. Stropes's residence, and Mr. Blakely's description

of the guns given to Mr. Stropes matched the description of guns that Buford Blakely reported as stolen.

As to the issue of forcible entry, the district court found that the brief five second delays between repeatedly knocking and announcing and the subsequent fifteen second wait with no response after the final knock was a reasonable amount of time to delay before battering the door. The district court based its legal conclusion on that facts that officers suspected the presence of drugs and guns and reasonably believed their yelling and pounding on the door would alert people in the house of their presence. We agree.

"The determination of whether an officer was justified in forcing entry after announcing his presence and purpose does not turn on any hard and fast time limit, but depends upon the circumstances confronting the officer serving the warrant." Lucht, 18 F.3d at 549; see also, United States v. Vesey, 338 F.3d 913, 916 (8th Cir. 2003) (approving a ten second delay where the residence was small and officers suspected the presence of drugs); Goodson, 165 F.3d at 614 (approving a twenty second delay where officers suspected the presence of drugs and expressed a legitimate concern for officer safety). Here, contrary to Mr. Stropes's arguments, the officers' probable cause was based on specific, credible, corroborated evidence. Mr. Blakely incriminated himself when he claimed that he traded guns to pay his drug debt to Mr. Stropes. He also specifically identified the guns he gave to Mr. Stropes, and the officers knew Mr. Blakely's description matched Buford Blakely's own description of the missing guns. With this reliable, corroborated tip, officers reasonably suspected that they faced a drug dealer who sought multiple firearms and traded drugs for those firearms. Further, Officer Jirak pounded on the door and yelled loudly enough that an officer at the rear of the house heard him. Under these circumstances, officer safety is a clear concern and fifteen to twenty seconds is a sufficient time to wait before entering the home of a suspected drug dealer to search for multiple stolen firearms.

Although Mr. Stropes focuses on the facts that he had neither a criminal record, a history of resisting arrest, nor a history of violence, these factors are not prerequisites to a finding that officers had a reason to suspect danger. Mr. Stropes also argues that quick entry was unnecessary because officers reasonably could not have believed that he might quickly destroy the large guns that were the object of the warrant. Mr. Stropes's argument is misplaced because the information from Mr. Blakely clearly showed that officer safety rather than the destruction of evidence was the primary concern surrounding the search of Mr. Stropes's residence. See Lucht, 18 F.3d at 549 ("The need to force entry may result from danger to the safety of the entering officers or from the imminent destruction of evidence."). On the facts of this case, the wait was sufficient. We need not address the issue of exigency further because the officers satisfied the knock-and-announce requirement. See Vesey, 338 F.3d at 916 (finding the execution of a warrant constitutional under the Fourth Amendment based on officers' satisfaction of the knock and announce requirement).

The judgment of the district court is affirmed.

_____